Bethany A. Davis Noll, N.Y. State Bar #4541116
bethany.davisnoll@nyu.edu
*(pro hac vice pending)*
Denise Grab, Cal. State Bar #268097
denise.grab@nyu.edu
Jack Lienke, N.Y. State Bar #5066386
jack.lienke@nyu.edu
*(pro hac vice pending)*
Richard L. Revesz, N.Y. State Bar #2044725
richard.revesz@nyu.edu
*(pro hac vice pending)*
Institute for Policy Integrity
New York University Law School
139 MacDougal, 3rd floor
New York, NY 10012
T: (212) 998-6239
F: (212) 995-4592

Counsel for *Amicus Curiae*
Institute for Policy Integrity

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, Attorney General; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, Attorney General, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; OFFICE OF NATURAL RESOURCES REVENUE; RYAN ZINKE, Secretary of the Interior; and GREGORY GOULD, Director, Office of Natural Resources Revenue, <br><br> *Defendants*. | Case No. 17-cv-05948-SBA <br><br> BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT <br><br> Hearing: October 10, 2018 <br> Time: 1:00 p.m. <br> Courtroom: TBD <br> Judge: Hon. Saundra Brown Armstrong |

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........................................................................1

SUMMARY OF ARGUMENT ............................................................................2

BACKGROUND ...........................................................................................4

ARGUMENT ...............................................................................................7

ONRR HAS NOT PROVIDED A REASONED EXPLANATION FOR REPEALING THE VALUATION RULE.....................................................................................7

    A.  The Repeal Rule's Economic and Environmental Analysis Is Fundamentally Flawed...............................................................................................7

        1.  ONRR Fails to Provide an Explanation for Forgoing the Valuation Rule's Benefits ...........................................................................................7

        2.  ONRR Ignores the Health and Environmental Consequences of Increased Production .....................................................................................10

    B.  ONRR's Justification for Issuing the Repeal Rule Is Arbitrary and Capricious .........12

        1.  ONRR's Claim that Repealing and Replacing the Valuation Rule Is Less Costly than Correcting the "Defects" Is Unsupported...................................12

        2.  The Court Should Reject ONRR's Attempt to Justify the Repeal Rule Through Reliance on ONRR's Illegal Suspension of the Valuation Rule.......14

CONCLUSION............................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87 (1983) ................................. 11

*Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953 (N.D. Cal. 2017) ......................................... 14

*California v. U.S. Bureau of Land Mgmt.*,
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...................................................................... 2, 8, 14

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ................................................................................ 10-11

*F.C.C. v. Fox Television Stations*,
    556 U.S. 502 (2009) ..................................................................................................... 7, 13

*Gen. Chem. Corp. v. United States*, 817 F.2d 844 (D.C. Cir. 1987)..................................... 10

*Interstate Natural Gas Co. v. Southern California Gas Co.*,
    209 F.2d 380 (9th Cir. 1953) ............................................................................................. 6

*Johnston v. Davis*, 698 F.2d 1088 (10th Cir. 1983) .............................................................. 8

*Kao v. Abbott Laboratories Inc.*,
    2017 WL 5257041 (N.D. Cal. Nov. 13, 2017) .............................................................. 6

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)....................................................................................................... 8

*Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003) ...................... 11

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016)........................................................................................ 8

*Montana Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074 (D. Mont. 2017) 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................ 7, 10-11

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)......................................................................................................... 10

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012)................................................................................... 7-8

## TABLE OF AUTHORITIES (cont.)

**Cases (cont.)**                                                                    **Page(s)**

*Nat. Res. Defense Council, Inc. v. EPA.*, 683 F.2d 752 (3d Cir. 1982) ............................................ 14

*NetCoalition v. SEC*, 615 F.3d 525 (D.C. Cir. 2013) ........................................ 13

*Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39 (2d Cir. 2003)......................................... 10

*Pub. Citizen v. Steed*, 733 F.2d 93 (D.C. Cir. 1984) ........................................ 13

*Roy v. County of Los Angeles*,
    2018 WL 914773 (C.D. Cal. Feb. 7, 2018) ...................................................... 6

*S.W. Ctr. For Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) ........................................................ 8

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017) ................................................. 2, 11

*Woodfin Suite Hotels, LLC v. City of Emeryville*, 2007 WL 81911 (N.D. Cal. 2007) ........................ 6

**Statutes**

5 U.S.C. § 551(5) ................................................................... 7

30 U.S.C. § 1701 ................................................................... 4

30 U.S.C. § 1711(a) ................................................................. 4

30 U.S.C. § 191 .................................................................... 4

**Regulations**

Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform, 82 Fed.
    Reg. 36,934 (Aug. 7, 2017) .............................................. passim

Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform, 81 Fed. Reg. 43,338
    (July 1, 2016) .......................................................... passim

Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform, Proposed Rule, 80
    Fed. Reg. 608 (Jan. 6, 2015).............................................. 5-6

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). ...................... 8-9

**TABLE OF AUTHORITIES (cont.)**

**Other Authorities**                                                                               **Page(s)**

Caroline Cecot & Kip Viscusi, *Judicial Review of Agency Cost-Benefit Analysis*,
     22 Geo. Mason L. Rev. 575 (2015) ................................................................... 9

EPA, Guidelines for Preparing Economic Analyses,
     https://nepis.epa.gov/Exe/ZyPDF.cgi/P100PJVS.PDF?Dockey=P100PJVS.PDF (2010) ............... 9

Jayni Hein, Profile, Institute for Policy Integrity,
     http://policyintegrity.org/jaynihein .......................................................... 1

Letter to Chairman Wyden from Ken Salazar, Secretary of the Interior (Feb. 7, 2013),
     https://www.energy.senate.gov/public/index.cfm/files/serve?File_id=94316913-27C1-4152-A272-
     7CABFF2010C8 ................................................................................. 6

Letter to Ken Salazar from Senators Lisa Murkowski and Ron Wyden (Jan. 2, 2013),
     https://www.energy.senate.gov/public/index.cfm/2013/2/interior-responds-to-wyden-murkowski-
     coal-letter. ................................................................................. 5

Office of Mgmt. & Budget, Circular A-4 (2003), https://www.whitehouse.gov/omb/circulars/ ... 9, 11

Office of Mgmt. & Budget, Memorandum: Implementing Executive Order 13,771, Titled "Reducing
     Regulation and Controlling Regulatory Costs" (Apr. 5, 2017),
     https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-21-
     OMB.pdf ..................................................................................... 8-9

Policy Integrity Comments on ONRR's Proposed Reform of Consolidated Federal Oil and Gas and
     Federal and Indian Coal Valuation Rule (May 8, 2015),
     https://www.regulations.gov/document?D=ONRR-2012-0004-0267. ............................... 2

Policy Integrity Comments on ONRR's Proposed Repeal of Consolidated Federal Oil and Gas and
     Federal and Indian Coal Valuation Reform Rule (May 4, 2017),
     https://www.regulations.gov/document?D=ONRR-2017-0001-0079. ............................... 1

Richard L. Revesz, Publications, Institute for Policy Integrity, *available at*
     https://its.law.nyu.edu/facultyprofiles/index.cfm?fuseaction=profile.publications&personid=2022
     8 .......................................................................................... 2

Subcommittee on Royalty Management, Report to the Royalty Policy Committee on Mineral
     Revenue Collection from Federal and Indian Lands and the Outer Continental Shelf (Dec. 17,
     2007), https://permanent.access.gpo.gov/lps96276/RPCRMS1207.pdf.......................... 5

U.S. Dep't of Interior, Fact Sheet: Federal Coal Royalties and Their Impact on Western States
     (2013), *available at* https://www.energy.senate.gov/public/index.cfm/2013/2/interior-responds-to-
     wyden-murkowski-coal-letter.............................................................. 4, 10-11

**TABLE OF AUTHORITIES (cont.)**

**Other Authorities (cont.)**                                                                          **Page(s)**

U.S. Dep't of Interior, Office of the Inspector General, Evaluation: Coal Management Program
    (2013), http://www.documentcloud.org/documents/712402-inspector-generals-report-on-coal-
    leases.html.................................................................................................................... 5

U.S. Gov't Accountability Office, Actions Needed for Interior to Better Ensure a Fair Return (GAO-
    14- 50) (2013), https://www.gao.gov/products/GAO-14-50 ........................................... 5

U.S. Gov't Accountability Office, The Federal System for Collecting Oil and Gas Revenues Needs
    Comprehensive Reassessment, GAO-08-691 (2008),
    https://www.gao.gov/products/GAO-08-691............................................................... 5

U.S. Gov't Accountability Office, Oil and Gas Resources: Interior's Production Verification Efforts
    and Royalty Data have Improved, But Further Actiosn Needed, GAO-15-39 (2015),
    https://www.gao.gov/products/GAO-15-39................................................................ 5

U.S. Gov't Accountability Office, Oil and Gas Revenues, GAO-07-676R, (2007),
    https://www.gao.gov/products/GAO-07-676R. ......................................................... 5

The Institute for Policy Integrity at New York University School of Law ("Policy Integrity")[1] submits this brief as *amicus curiae* in support of plaintiffs' motion for summary judgment seeking vacatur of the Office of Natural Resources Revenue's ("ONRR") decision to repeal the "Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform," 81 Fed. Reg. 43,338 (July 1, 2016) ("Valuation Rule") (AR 39-104). *See* "Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform," 82 Fed. Reg. 36,934 (Aug. 7, 2017) ("Repeal Rule") (AR 10243-10298).

### INTEREST OF AMICUS CURIAE

Policy Integrity is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy, with a particular focus on environmental and economic issues. An area of special concern for Policy Integrity is the proper valuation of the economic and environmental impacts of natural resource extraction. Policy Integrity consists of a team of legal and economic experts, trained in the estimation of costs and benefits and the application of economic principles to regulatory decisionmaking. Our director, Richard L. Revesz, has published more than eighty articles and books on environmental and administrative law, including several works that address the legal and economic principles that inform rational regulatory decisions.[2] Additionally, our policy director, Jayni Foley Hein, has written several articles and reports focused on natural resources management and conservation as well as valuation and royalties.[3]

In furtherance of its mission to promote rational decisionmaking, Policy Integrity has filed *amicus curiae* briefs addressing agency analysis of costs and benefits in many cases involving natural resource management. For example, in the U.S. Court of Appeals for the Tenth Circuit, Policy Integrity

---

[1] This brief does not purport to represent the views of New York University School of Law, if any. Policy Integrity states that no party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person—other than the amicus curiae, its members, or its counsel—contributed money intended to fund the preparation or submission of this brief.

[2] Richard L. Revesz, Publications, *available at* https://its.law.nyu.edu/facultyprofiles/index.cfm?fuseaction=profile.publications&personid=20228

[3] Jayni Hein, Profile, http://policyintegrity.org/jaynihein.

filed a brief supporting a challenge to the Bureau of Land Management's ("BLM") approval of four coal leases in Wyoming's Powder River Basin. The brief pointed to basic economic principles to show that BLM's failure to consider the effect of additional coal leases on coal consumption was irrational. Br. for Inst. for Policy Integrity as *Amicus Curiae*, *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1235 (10th Cir. 2017). The Tenth Circuit agreed that the agency had improperly failed to consider the extent to which increased mining would, by lowering the price of coal, lead to increased coal consumption. *WildEarth Guardians*, 870 F.3d at 1235.

In addition, Policy Integrity has filed amicus briefs critiquing agencies' economic analyses for regulatory repeals and suspensions similar to the Repeal Rule at issue here. For example, in this district, Policy Integrity filed a brief opposing BLM's decision to suspend a leak prevention rule without considering the rule's forgone benefits. *See e.g.*, Br. for Inst. for Policy Integrity as *Amicus Curiae*, *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017) (Laporte, M.J.). In that case, the court agreed that BLM's failure to consider the forgone benefits was arbitrary and capricious. *California*, 277 F. Supp. 3d at 1123.

Policy Integrity also has experience with the rules at issue here, having submitted comments to ONRR on both the proposed Valuation Rule[4] and the proposed Repeal Rule.[5] Policy Integrity's expertise in cost-benefit analysis and experience with these rules give it a unique perspective from which to evaluate plaintiffs' claims that the Repeal Rule is arbitrary and capricious.

### SUMMARY OF ARGUMENT

As plaintiffs have explained, ONRR does not provide an adequate explanation for repealing the Valuation Rule. Plaintiffs' Memorandum of Points and Authorities at 17 ("States' Br."); Conservation Group's Proposed Memorandum in Support of Motion at 8 ("Conservation Groups'

---

[4] *See, e.g.,* Institute Policy Integrity Comments on ONRR's Proposed Reform of Consolidated Federal Oil and Gas and Federal and Indian Coal Valuation Rule (May 8, 2015). Website urls for these documents are provided in the table of authorities.

[5] Institute for Policy Integrity Comments on ONRR's Proposed Repeal of Consolidated Federal Oil and Gas and Federal and Indian Coal Valuation Reform Rule (May 4, 2017) (AR 6750-6751).

Br."). That lack of an adequate explanation is particularly apparent in the agency's analysis of the costs and benefits of the Repeal Rule, as well as in ONRR's claim that repealing and replacing is less expensive than maintaining the Valuation Rule while working to fix asserted "defects" in the rule. This amicus brief thus focuses specifically and uniquely on those issues.

ONRR's assessment of the Repeal Rule's costs and benefits is fundamentally flawed in at least two respects. First, the agency fails to acknowledge the forgone benefits of the repeal. In issuing the Valuation Rule, ONRR found that the rule would provide net benefits to society by reducing the administrative costs associated with valuing mineral resources. By forgoing those savings, the Repeal Rule imposes net costs. Rather than justify that loss in the Repeal Rule, ONRR obscures its impact by claiming that the royalty savings make up for the higher administrative costs. But ONRR's task is to determine whether *society* will be better off as a result of repeal, not whether *industry* will be better off. And from that perspective, any money that industry saves in lower royalty payments is money that federal and state taxpayers lose by not receiving those same payments. Thus, those royalty savings cannot offset the administrative costs imposed by the Repeal Rule.

Second, ONRR fails to assess the potential health and environmental costs of repeal. In the Repeal Rule, the agency claims that the Valuation Rule would have led to decreased fossil fuel production. But if that is true, then it necessarily follows that the Repeal Rule will lead to an increase in production. ONRR's failure to acknowledge the health and environmental harms that will flow from that increased production is arbitrary and capricious.

In addition to preparing an inadequate cost-benefit analysis, ONRR provides poor justifications for reversing the Valuation Rule's reforms to the royalty calculation process. Those reforms would have ensured that states and the federal government receive the full value of royalties due under the law. ONRR is required to explain its decision to reverse course. But rather than provide any justification for depriving states and the federal government of this revenue, ONRR claims that "defects" in the Valuation Rule make the rule difficult to implement. According to ONRR, repealing the rule and later issuing a replacement is cheaper than maintaining the rule while fixing the defects. 82 Fed. Reg. at 36,940. But the defects ONRR cites do not seem that costly to fix through an amendment or simple guidance document. ONRR is not permitted to deprive the federal government

and states of significant revenues with such conclusory claims. Moreover, ONRR's justifications for repeal rely heavily on claims of uncertainty regarding the Valuation Rule's implementation—uncertainty that exists, at least in part, because the agency illegally stayed the Valuation Rule six months before repeal. Allowing ONRR to rely on that uncertainty would improperly reward the agency for taking an illegal action. For all these reasons, the Repeal Rule should be vacated.

## BACKGROUND

ONRR is required "to accurately determine oil and gas royalties," 30 U.S.C. § 1711(a), and to "ensure the prompt and proper collection and disbursement of oil and gas revenues" owed to the United States, tribes, and the states, *id.* § 1701(b)(3). Royalty revenues collected by ONRR are divided between the federal government and the states where the mining takes place. *See* 30 U.S.C. § 191 (explaining that royalties from onshore mining are divided evenly); *see also* 82 Fed. Reg. at 36,951 (describing breakdown for different programs). Royalties are an important source of revenue for some states, which use the money to fund municipal budgets. *See* U.S. Dep't of Interior, Fact Sheet: Federal Coal Royalties and their Impact on Western States (2013).[6]

Before ONRR issued the Valuation Rule, coal companies with mining or drilling leases on federal land were required to use a cumbersome "benchmarks" procedure to calculate the royalties owed on non-arm's-length—or "captive"—sales, where a company sells minerals to one of its own subsidiaries or vice versa. *See* 81 Fed. Reg. at 43,338; *see also* Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform, Proposed Rule, 80 Fed. Reg. 608, 628 (Jan. 6, 2015). These benchmarks "were difficult to use in practice." 81 Fed. Reg. at 43,354. For example, the first benchmark required lessees to use arm's length prices from "comparable" sales, but pricing information from comparable sales is difficult to obtain because that information is considered proprietary. 81 Fed. Reg. at 43,354; *see also* 80 Fed. Reg. at 617, 628. As a result, it was difficult for ONRR to ensure that lessees paid royalties based on the fair market value of the minerals sold, rather

---

[6] Website urls for all cited documents that are available online are provided in the table of authorities.

than on artificially low prices received in "captive" transactions. *See* 80 Fed. Reg. at 608, 616-7, 628. (*See also* AR 6750-6751 (public comments describing reports showing that captive transactions likely deprived ONNR of millions of dollars).)

Efforts to study and reform the royalty payment system in response to these and other concerns go back more than ten years. In 2007, after finding that the royalties paid for oil, gas, and coal mined on federal land were among the lowest in the world, the Government Accountability Office ("GAO") called on the Department of Interior ("Interior") to evaluate and update royalty procedures. U.S. Gov't Accountability Office, GAO-07-676R, Oil and Gas Revenues (2007). Also in 2007, Interior appointed a Subcommittee on Royalty Management to address concerns about royalty payments. *See* Subcommittee on Royalty Management, Report to the Royalty Policy Committee on Mineral Revenue Collection from Federal and Indian Lands and the Outer Continental Shelf at vii (Dec. 17, 2007). The Subcommittee made several recommendations, including a recommendation that ONRR use market indices to value transactions rather than the benchmarks system. *Id.* at xvii.

Over the next several years, the GAO continued to call on Interior to reform royalty procedures.[7] And, in 2013, the Office of the Inspector General at Interior similarly identified weaknesses in the payment system, which put Interior at risk of not receiving the full fair market value of its leases.[8] Also in 2013, a bipartisan team of Senators called for an investigation and reform of any regulations that were "inadequate to ensure that full royalty value is returned."[9]

In response to these calls for reform, Interior explained in 2013 that it had begun a process to review and consider improvements that "could dramatically improve compliance and reduce

---

[7] *See* U.S. Gov't Accountability Office, GAO-15-39, Oil and Gas Resources: Interior's Production Verification Efforts and Royalty Data Have Improved, but Further Actions Needed (2015); U.S. Gov't Accountability Office, GAO-14-50, Actions Needed For Interior to Better Ensure A Fair Return (2013); U.S. Gov't Accountability Office, GAO-08-691, The Federal System for Collecting Oil and Gas Revenues Needs Comprehensive Reassessment at 7-10 (2008).

[8] U.S. Dep't of the Interior, Office of the Inspector General, Evaluation: Coal Management Program at 1 (June 2013) (describing weaknesses in the coal valuation procedures).

[9] Letter to Ken Salazar from Senators Lisa Murkowski and Ron Wyden (Jan. 2, 2013).

administrative costs for industry and the Government."[10] Three years later, after holding several public workshops, providing a lengthy comment period, and reviewing thousands of pages of public comments, ONRR issued the Valuation Rule. 81 Fed. Reg. at 43,338. In the Valuation Rule, ONRR sought to provide "greater simplicity, certainty, clarity, and consistency in product valuation for mineral lessees and mineral revenue recipients," decrease "industry's cost of compliance," and ensure that "companies have paid every dollar due" to federal and state taxpayers. *Id.*[11]

To serve these goals, ONRR did away with the antiquated benchmarks system and adopted a simpler approach that assessed royalties against the price obtained in the first *actual* arm's length sale of the resource. 81 Fed. Reg. at 43,338-39; *see also* 80 Fed. Reg. at 609; States' Br. at 6. The agency predicted that the Valuation Rule would have two primary effects. First, by simplifying the procedures for valuing federal mineral resources, the rule would decrease administrative costs by $3.6 million per year. 81 Fed. Reg. at 43,359-60. *See also id.* at 43,339; 80 Fed Reg. at 608. Second, by making clear that companies are required to pay royalties based on the first arm's length transaction and updating valuation procedures in several other ways, the rule was expected to increase royalty revenue for federal and state taxpayers by almost $80 million per year. *See* 81 Fed. Reg. at 43,367.

In the Repeal Rule, ONRR turns its back on these long-awaited reforms. That reversal is arbitrary and capricious, both because ONRR fails to accurately assess the Repeal Rule's economic impact and because ONRR fails to provide a reasoned explanation for the abrupt change in course.

---

[10] Letter to Chairman Wyden from Ken Salazar, Secretary of the Interior (Feb. 7, 2013).

[11] The Department of Interior's Fact Sheet, GAO reports, the Subcommittee report, and the Office of the Inspector General report are subject to judicial notice as "records and reports of administrative bodies." *Interstate Nat. Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953); *see also Roy v. County of Los Angeles*, 2018 WL 914773, at *15 (C.D. Cal. Feb. 7, 2018) (taking judicial notice of GAO report among other records and reports).

In addition, the court may take judicial notice of the letter exchange between Senators Murkowski and Wyden and Secretary Salazar, as the letters are available on the Senate's website, as provided in the table of authorities. *See Kao v. Abbott Laboratories Inc.*, 2017 WL 5257041, at *3 (N.D. Cal. Nov. 13, 2017) (Tigar, D.J.) (taking judicial notice of guidance document and other documents on agency websites). For all of these documents, amicus is only requesting judicial notice of the fact that the reports and letters were published, "not of the truth of their content." *Woodfin Suite Hotels, LLC v. City of Emeryville*, 2007 WL 81911, at *3 (N.D. Cal. 2007) (Armstrong, D.J.).

**ARGUMENT**

**ONRR HAS NOT PROVIDED A REASONED EXPLANATION FOR REPEALING THE VALUATION RULE**

The Administrative Procedure Act (APA) requires ONRR to "examine the relevant data" and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" when issuing any new regulation. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("State Farm")*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). These principles apply to repeals just like they apply to new regulations. *Id.*; 5 U.S.C. § 551(5). Specifically, when an agency reverses course through a repeal, it must provide a "reasoned explanation" for dismissing the "facts and circumstances that underlay" the original rule. *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009).

In the Repeal Rule, ONRR fails to cite new information since the agency finalized the Valuation Rule to support its decision. Instead, ONRR cites "defects" in the Valuation Rule to justify reversal. 82 Fed. Reg. at 36,934. But that reversal is arbitrary and capricious because (1) ONRR fails to adequately assess the economic and environmental impacts of its action and (2) ONRR's citation to "defects" is inadequate to justify the decision to deprive federal and state taxpayers of increased royalty revenue.

**A.  The Repeal Rule's Economic and Environmental Analysis Is Fundamentally Flawed**

When an agency relies on an economic analysis to support its rulemaking, "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). As part of the Repeal Rule, ONRR prepared an analysis of the repeal's economic impacts. *See* 82 Fed. Reg. at 36,943. That analysis contains two fundamental errors, which render the Repeal Rule arbitrary and capricious.

**1.  ONRR Fails to Provide an Explanation for Forgoing the Valuation Rule's Benefits**

The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action." *See State Farm*, 463 U.S. at 43. Courts will reverse where an examination of the agency's explanation makes clear that the agency failed to consider "an important aspect of the problem." *Id.* One important factor in an agency decision is the cost that the decision imposes on

society. Executive Order 12,866, the main executive order that has governed regulatory decision-making since 1993 and continues to govern today,[12] instructs agencies to consider the costs of the decision, including "any adverse effects . . . on health, safety and the natural environment" when assessing a regulation's costs. Exec. Order No. 12,866 § 6(a)(3)(C)(ii), 58 Fed. Reg. 51,735 (Sept. 30, 1993) ("Executive Order 12,866").[13] And courts have consistently required agencies to take the costs of their actions into account. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (explaining that under 42 U.S.C. § 7412, "[n]o regulation is 'appropriate' if it does significantly more harm than good"); *New York v. Reilly*, 969 F.2d 1147, 1153 (D.C. Cir. 1992) (remanding rule where agency failed to explain how economic benefits would justify forgoing promised air benefits); *Johnston v. Davis*, 698 F.2d 1088, 1094-95 (10th Cir. 1983) (remanding an environmental study because it made "no mention" of a crucial factor that would make the action net costly).

In the context of a repeal, costs include the forgone benefits of the repealed rule. *See Michigan*, 135 S. Ct. at 2707 ("'[C]ost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost."). Failure to consider those forgone benefits renders the rule arbitrary and capricious. *California*, 277 F. Supp. 3d at 1122 (holding that failure to consider forgone benefits was arbitrary and capricious); *cf. Nat'l Ass'n of Home Builders*, 682 F.3d at 1039 (finding that the agency properly calculated the costs of amending a regulation); *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 730 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) (Considering the costs of a repeal "is common sense and settled law.").

ONRR did not adequately address the forgone benefits of the Repeal Rule. The Valuation Rule was expected to generate annual net benefits of $3.6 million, in the form of administrative costs

---

[12] *See* Office of Mgmt. & Budget, Memorandum: Implementing Executive Order 13,771, Titled "Reducing Regulation and Controlling Regulatory Costs" pt. II (Apr. 5, 2017) ("EO 12866 remains the primary governing EO regarding regulatory planning and review.").

[13] Citation to extra-record information is appropriate to explain "technical terms or complex subject matter." *S.W. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

savings resulting from its simpler calculation methods. 81 Fed. Reg. at 43,360. And repealing the rule imposed annual net costs by forgoing those administrative cost savings. In the Repeal Rule, ONRR concedes that the repeal will impose "additional administrative costs" because it will forgo the Valuation Rule's administrative cost savings.[14] *See* 82 Fed. Reg. 36,946. But ONRR does not acknowledge that the repeal results in *net* costs. Neither does it attempt to justify this result. Instead, ONRR attempts to obscure the effect of its decision by pointing to the royalty payments that industry would no longer be making and asserting that repeal would result "in an overall savings to the industry." 82 Fed. Reg. at 36,951-52; *see also id.* at 36,944 (showing increases in administrative costs in a chart alongside decreases in royalty payments).

But the appropriate question for ONRR in its cost-benefit analysis, is not whether *industry* will be better off as a result of the Repeal Rule, but whether *society* will be better off. *See* Exec. Order No. 12,866 § 1(b)(11) ("Each agency shall tailor its regulation to impose the least burden *on society* . . . " (emphasis added)).[15] From the perspective of society, changes in royalty payments are neither a cost nor a benefit of the rule, but a transfer from industry to federal and state taxpayers, with distributional impacts. *See* Office of Management and Budget, Circular A-4 at 14, 38 (2003)[16] (explaining that "monetary payments from one group to another . . . do not affect total resources available to society"). In other words, any savings for industry from royalty payments are entirely offset by losses to federal and state governments from decreased royalty revenue, which would have been used to fund important

---

[14] The forgone cost savings in the Repeal Rule are higher than the administrative cost savings in the Valuation Rule. The difference stems from ONRR's use of updated Bureau of Labor Statistics for hourly wages and inclusion of certain additional categories of forgone savings in the Repeal Rule, which had not been included as cost savings in the Valuation Rule. *See* 82 Fed. Reg. at 36,948.

[15] *See also* EPA, Guidelines for Preparing Economic Analyses at A-6 ("[Cost-benefit analysis] can be thought of as an accounting framework of the overall social welfare of a program…"); Caroline Cecot & Kip Viscusi, *Judicial Review of Agency Cost-Benefit Analysis*, 22 Geo. Mason L. Rev. 575, 580 (2015) ("[I]f the agency is guided by [cost-benefit analysis], it may only promulgate the rule if society, on net, would benefit from the rule.").

[16] Circular A-4 was originally issued under President George W. Bush and the current administration has instructed agencies to follow it. Office of Mgmt. & Budget, Memorandum: Implementing Executive Order 13,771, Titled "Reducing Regulation and Controlling Regulatory Costs" (Apr. 5, 2017).

municipal projects. Thus changes in industry's royalty payments cannot offset the additional costs.

ONRR's myopic focus on the effect that the Repeal Rule will have on industry is a fundamental error that caused the agency to ignore the duty to explain why the imposition of forgone benefits is justified. ONRR is not permitted to "put a thumb on the scale" by emphasizing the benefits to industry to achieve a desired objective. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008); *see also Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 58 (2d Cir. 2003) (holding that a rule "that does not explain why the costs saved were worth the benefits sacrificed" is arbitrary and capricious"). Because ONRR ignores its obligation to explain the decision to forgo the benefits of the Valuation Rule, the Repeal Rule must be vacated as arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

### 2.  ONRR Ignores the Health and Environmental Consequences of Increased Production

ONRR's analysis of the Repeal Rule's impact on mineral production is also fundamentally flawed. Contrary to previous conclusions and without any supporting data, ONRR claims that the Valuation Rule would have "unnecessarily obstructed, delayed, curtailed, or otherwise imposed significant costs on the production, utilization, or delivery" of oil, gas, and coal. 82 Fed. Reg. at 36,939; *see also id.* at 36,937–38. As plaintiffs explain, this claim contradicts ONRR's prior conclusion in the Valuation Rule that the reform would not "alter, in any material way, natural resources exploration, production, or transportation." 81 Fed. Reg. at 43,368; *See also* States' Br. at 19; Conservation Group's Br. at 14. Indeed, elsewhere in the Repeal Rule itself, ONRR contradicts the claim, asserting that "[t]he procedural changes resulting from the repeal of the 2017 Valuation Rule will have no consequence on the physical environment" and that the repeal will not "alter in any material way, natural resources exploration, production, or transportation." 82 Fed. Reg. at 36,593. That inconsistency alone is a reason to find the Repeal Rule arbitrary and capricious. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (an unexplained inconsistency is "a reason for holding an interpretation to be an arbitrary and capricious change"); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (finding the agency's action arbitrary and capricious due to the internal inconsistencies in the agency's reasoning).

In any event, if ONRR is correct that the Valuation Rule would have led to decreased

production, then it follows that the Repeal Rule will *increase* production and ONRR should have addressed this issue. As ONRR's analysis of the "royalty impacts" concedes, the appropriate baseline for analysis is a world in which the Valuation Rule is in effect. *See* 82 Fed. Reg. at 36,944, 36,951 (showing forgone royalty payments of the Valuation Rule); *see also* Circular A-4 at 15, 18 (The baseline is meant to be an accurate description of the world, absent the rule at issue.). Because the Repeal Rule removes the impact of the Valuation Rule, then the Repeal Rule would—assuming ONRR is right about the Valuation Rule's impact on production—increase production relative to the baseline.

That increase would, in turn, cause health and environmental harms, which ONRR was required to take into account when assessing the rule's costs and benefits. *See State Farm*, 463 U.S. at 43 (agencies must consider "important aspects of the problem"); *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 96 (1983) (explaining that under the National Environmental Policy Act, agencies must "consider and disclose the actual environmental effects" of foreseeable increases in production in a way that "brings those effects to bear" on the decision).

Mineral production and exploration cause numerous environmental impacts, varying with the amount, location, and nature of the minerals developed, among other factors. For example, basic economic principles of supply and demand provide that any significant increase in mineral production and supply will decrease the price of the mineral resources, and that lower prices give rise to increased consumption. *See WildEarth Guardians*, 870 F.3d at 1235 (holding that the agency's assumption that new coal leases would not increase the overall level of coal mining was arbitrary and capricious); *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) ("[T]he increased availability of inexpensive coal will at the very least make coal a more attractive option to future entrants into the utilities market."). Changes in consumption, in turn, can result in changes to associated emissions. *See, e.g.*, *Montana Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1103-04 (D. Mont. 2017). Thus, if repealing the Valuation Rule will, as ONRR claims, increase production, then it would also impose health and environmental costs, many of which are quantifiable. *See Center for Biological Diversity*, 538 F.3d at 1200 (holding that agency's failure to quantify benefits of energy conservation was arbitrary and capricious). ONRR's failure to assess these costs and justify their imposition is arbitrary and capricious.

**B.  ONRR's Justification for Issuing the Repeal Rule Is Arbitrary and Capricious**

**1.  ONRR's Claim that Repealing and Replacing the Valuation Rule Is Less Costly than Correcting the "Defects" Is Unsupported**

In addition to performing an inadequate cost-benefit analysis, ONRR's justification for forgoing royalty payments to the federal government and states is also flawed. ONRR issued the Valuation Rule in order to "provide early certainty to industry and to ONRR that companies have paid every dollar due" for resources extracted from public lands. 81 Fed. Reg. at 43,338. The Valuation Rule's updates were expected to increase industry payments by almost $80 million per year. 81 Fed. Reg. at 43,360. By repealing the Valuation Rule, ONRR deprives the federal government and states of those additional payments. That loss will be felt particularly hard by the affected states, which stand to lose significant funding for schools, road construction, and municipal budgets.[17] *See* 82 Fed. Reg. at 36,951 (showing that repeal causes losses to states of more than $15 million per year).

In the Repeal Rule, ONRR does not address at all how or why it is justified in depriving the states and federal government of those payments or cite any new evidence. Instead, ONRR points to scattered "defects" in the Valuation Rule and asserts—in a conclusory fashion—that "[t]he cost of implementing the rule and subsequently trying to fix the defects in one or more separate rulemakings would far exceed the cost of repealing and replacing the rule." 82 Fed. Reg. at 36,940; *see also id.* at 36,934. But none of the "defects" ONRR cites appear costly to fix. Indeed, it is possible they could have been fixed either through guidance or an amendment. For example, ONRR claims that the Valuation Rule would have caused confusion because it instructed lessees to value coal based on the gross proceeds that accrue to "you," rather than "you and affiliates." 82 Fed. Reg. at 36,936. The implication of ONRR's claim is that the agency had been trying to make clear that companies should pay royalties based on the value of the minerals when sold at arm's length, whether that value was obtained by the mining company or an affiliate, and the word "you" alone could cause uncertainty as to whether lessees are required to pay royalties on arm's length proceeds that accrue to affiliates.

---

[17] *See* U.S. Dep't of Interior, *Fact Sheet: Federal Coal Royalties and their Impact on Western States* (2013).

But there is no uncertainty on this point. The text of the Valuation Rule as a whole made clear that royalties must be paid on gross proceeds, whether they accrue to an affiliate or a lessee. *See* 81 Fed. Reg. at 43,390, 43,396. ONRR has not explained why what was at most a minor drafting error could not be solved by guidance or a simple amendment, rather than a full repeal. *See Pub. Citizen v. Steed*, 733 F.2d 93, 102 (D.C. Cir. 1984) (explaining that suspending a rule without adopting available alternatives was arbitrary and capricious).

Similarly, ONRR claims that the "default provision" in the Valuation Rule "created more confusion and uncertainty than it resolved," 82 Fed. Reg. at 36,937, but the agency offers no evidence to support that assertion. As ONRR explained in the Valuation Rule, the default provision would allow ONRR to establish the fair-market value for a transaction "only in very specific cases" where circumstances such as the lessee's misconduct or failure to provide documents render the agency unable to "reasonably determine the correct value of production." 81 Fed. Reg. at 43,341. Moreover, the "default provision" did not "alter the underlying principles of the previous regulations." *Id.* The statutes governing royalty payments always gave ONRR "the authority and considerable discretion to establish the reasonable value of production by using a variety of discretionary factors and any other information that the Secretary determines is relevant." *Id.* In adding the default provision, ONRR was seeking to add clarity and consistency to that exercise of discretion by specifically enumerating "when, where, and how the Secretary will use that discretion." *Id.* On repeal, ONRR cites no new evidence that would support a conclusion that the default provision was not advisable. As ONRR's previous analysis shows, the default provision makes the exercise of discretion more predictable—not more confusing and uncertain. ONRR's conclusory assertions about the need to repeal the Valuation Rule are insufficient to show that "there are good reasons for the new policy." *Fox Television Stations, Inc.*, 556 U.S. at 515; *see also NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2013) (holding that the court would not "defer to the agency's conclusory or unsupported suppositions" (internal quotation marks omitted)).

### 2. The Court Should Reject ONRR's Attempt to Justify the Repeal Rule Through Reliance on ONRR's Illegal Suspension of the Valuation Rule

A further, overarching problem with ONRR's attempt to justify the Repeal Rule is that it relies heavily on uncertainty as to how the Valuation Rule will be implemented—uncertainty that exists at least in part due to ONRR's own illegal actions. The Valuation Rule became effective in January 2017, 81 Fed Reg. at 43,338, and lessees were scheduled to begin paying royalties under the Valuation Rule's new procedures in February 2017, *see* 82 Fed. Reg. 11,823 (Feb. 27, 2017). But ONRR delayed the rule's effective date before those first payments could be made, 81 Fed. Reg. at 11,823.

A federal court has since found that the delay was illegal. *See Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953, 967 (N.D. Cal. 2017) (Laporte, M.J.). Notwithstanding that finding, on repeal, ONRR relies on the fact that the rule has not yet been implemented to justify the repeal. For example, ONRR claims that "several unforeseen defects in the 2017 Valuation Rule have the potential to significantly increase the cost and administrative burden of compliance, which *could* create a disincentive to enter [] into . . . leases." 82 Fed. Reg. at 36,939 (emphasis added). ONRR also contends that the Valuation Rule's requirement for contracts to be written for purposes of royalty valuation is "*potentially* costly" and "*could* increase the cost of production and delay the delivery of mineral resources." 82 Fed. Reg. at 36,937 (emphasis added).

As explained earlier, those statements are contradicted by ONRR's original findings that the Valuation Rule would decrease administrative costs and would not affect production. 81 Fed. Reg. at 43,360, 43,368. Additionally, agencies should not be given a "free pass . . . to exceed their statutory authority and ignore their legal obligations under the APA." *California*, 277 F. Supp. 3d at 1126. Had ONRR not illegally delayed the Valuation Rule's implementation, ONRR would have known at least something about whether those "potentially" costly problems were indeed occurring. Allowing ONRR to cite implementation-related uncertainty—uncertainty that exists at least in part due to the agency's illegal action—would improperly reward the agency for its bad behavior. The court should put "the parties in the positions they would have been in if the APA had not been violated," *Nat. Res. Defense Council, Inc. v. EPA*, 683 F.2d 752, 768 (3d Cir. 1982), and reject ONRR's attempt to justify the Repeal Rule by citing implementation-related uncertainty.

1

## CONCLUSION

2      This Court should grant plaintiffs' motion for summary judgment, vacate the Repeal Rule, and

3  reinstate the original compliance dates in the Valuation Rule.[18]

4

5      Dated:     New York, NY              Respectfully submitted,
                   June 25, 2018

6                                          /s/ Richard Revesz
                                           Bethany A. Davis Noll, N.Y. State Bar #4541116
7                                          bethany.davisnoll@nyu.edu
                                           *(pro hac vice pending)*
8                                          Denise Grab, Cal. State Bar #268097
                                           denise.grab@nyu.edu
9                                          Jack Lienke, N.Y. State Bar #5066386
                                           jack.lienke@nyu.edu
10                                         *(pro hac vice pending)*
                                           Richard L. Revesz, N.Y. State Bar #2044725
11                                         richard.revesz@nyu.edu
                                           *(pro hac vice pending)*
12                                         Institute for Policy Integrity
                                           New York University Law School
13                                         139 MacDougal, 3rd floor
                                           New York, NY 10012
14                                         T: (212) 998-6239
                                           F: (212) 995-4592
15

16

17                                         *Counsel for* Amicus Curiae
                                           *Institute for Policy Integrity*
18

19

20

21

22

23

24

25   _____

26

27      [18] Policy Integrity gratefully acknowledges the assistance of Sara Savarani and Alexandra St.

28   Romain, students in New York University School of Law's Regulatory Policy Clinic, in the
     preparation of this brief.