Gary J. Smith (SBN 141393)
BEVERIDGE & DIAMOND, P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104-1251
Telephone: (415) 262-4000
Facsimile: (415) 262-4040
gsmith@bdlaw.com

Peter J. Schaumberg, *pro hac vice*
James M. Auslander, *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1350 I St., N.W., Suite 700
Washington, DC 20005
Telephone: (202) 789-6009
Facsimile: (202) 789-6190
pschaumberg@bdlaw.com
jauslander@bdlaw.com

*Attorneys for Proposed Intervenors*
*NMA, WMA, and API*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | Case No. 4:17-cv-5948-SBA<br><br>**NATIONAL MINING ASSOCIATION, WYOMING MINING ASSOCIATION, AND AMERICAN PETROLEUM INSTITUTE CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: October 10, 2018<br>Time: 1:00 p.m.<br>Judge: Hon. Saundra Brown Armstrong |

1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that, on October 10, 2018, at 1:00 p.m., or as soon thereafter as

4

counsel may be heard in the courtroom of the Hon. Saundra B. Armstrong, Oakland Courthouse,

5

1301 Clay Street, Oakland, CA 94612, Proposed Intervenor-Defendants National Mining

6

Association ("NMA"), Wyoming Mining Association ("WMA"), and American Petroleum

7

Institute ("API") (collectively, "Associations"), will and hereby do respectfully move this Court

8

for summary judgment.

9

The Associations move for summary judgment on all claims asserted by Plaintiffs in this

10

action, pursuant to Federal Rule of Civil Procedure 56, because there is no genuine dispute as to

11

any material fact and they are entitled to judgment as a matter of law.  The Associations' motion is

12

based on this Notice and Motion, the accompanying Memorandum of Points and Authorities in

13

Support, the administrative record lodged with the Court by Federal Defendants, all pleadings and

14

papers filed in this action, and such oral argument and other matters as may be presented to the

15

Court at the time of hearing.  The Associations as proposed Intervenor-Defendants submit this

16

motion at this time in conformity with the deadline for Federal Defendants to file their cross-

17

motion for summary judgment, though the Court has not yet ruled on intervention.

18

19

Dated this 16th day of July, 2018.                    Respectfully submitted,

20

21

          /s/ Gary J. Smith

Gary J. Smith (SBN 141393)

22

BEVERIDGE & DIAMOND, P.C.

456 Montgomery Street, Suite 1800

23

San Francisco, CA 94104-1251

Telephone: (415) 262-4000

24

Facsimile: (415) 262-4040

gsmith@bdlaw.com

25

26

27

28

Peter J. Schaumberg, *pro hac vice*
James M. Auslander, *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1350 I St., N.W., Suite 700
Washington, DC 20005
Telephone: (202) 789-6009
Facsimile: (202) 789-6190
pschaumberg@bdlaw.com
jauslander@bdlaw.com

*Attorneys for Proposed Intervenors
NMA, WMA, and API*

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Background ........................................................................................................... 3

Standard of Review ............................................................................................. 7

Argument .............................................................................................................. 7

    I.    ONRR Properly Repealed the Legally and Practically Flawed 2016 Rule. ............... 7

        A.    For Three Decades ONRR Pursued More Certainty in Royalty Valuation. .... 8

        B.    The 2016 Rule Re-Created Broad Uncertainty for Lessees. ......................... 11

        C.    Core Provisions of the 2016 Rule Were Irreparably Broken. ...................... 13

    II.    The Repeal Rule Did Not Forfeit Any Material Benefit. ............................................ 21

Conclusion .......................................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Becerra v. U.S. Department of Interior*,
276 F. Supp. 3d 953 (N.D. Cal. 2017) ......................................................................6

*Bowen v. Georgetown Memorial Hospital*,
488 U.S. 204 (1988) ...................................................................................................18

*Exxon Corp.*,
118 IBLA 221, 1991 WL 218143 (1991) ..................................................................23

*General Electric Co. v. U.S. Enviromental Protection Agency*,
53 F.3d 1324 (D.C. Cir. 1995) ..................................................................................13

*Landgraf v. Usi Film Products*,
511 U.S. 244 (1994) ...................................................................................................18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 574 (1992) .............................................................................................4

*Petro-Lewis Corp.*,
108 IBLA 20, 1989 WL 255495 (1989) ....................................................................15

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) ...................................................................................................18

*State of New Mexico v. United States*,
11 Cl. Ct. 429 (1986) ...................................................................................................3

*United States v. AMC Entertainment Inc.*,
549 F.3d 760 (9th Cir. 2008) ....................................................................................13

**STATUTES**

5 U.S.C. § 705 ................................................................................................................6

30 U.S.C. § 191 ......................................................................................................3, 4, 22

30 U.S.C. §§ 207, 207(a) .........................................................................................8, 14

30 U.S.C. § 226(b) .........................................................................................................8

ii

30 U.S.C. § 1004(a) ...................................................................................14

30 U.S.C. § 1721(a) .....................................................................................9

**RULES AND REGULATIONS**

30 C.F.R. § 203.200 (1985)...........................................................................9

30 C.F.R. § 206.102(b)(1) (1988) ..................................................................9

30 C.F.R. § 206.102(c) (1988) .....................................................................10

30 C.F.R. § 206.103 (1987)...........................................................8, 9, 12, 16

30 C.F.R. § 206.152(b)(1) (1988) ..................................................................9

30 C.F.R. § 206.152(c) (1988) .....................................................................10

30 C.F.R. § 206.257(b) (1989) .......................................................................9

30 C.F.R. § 206.257(c)(2) (1989)..................................................................10

30 C.F.R. § 1206.20 (2016)......................................................................17, 19

30 C.F.R. § 1206.102(d)(2)(i) (2000) ...........................................................16

30 C.F.R. § 1206.103(g) (2016)....................................................................19

30 C.F.R. § 1206.104(a)(1) (2016) ...............................................................12

30 C.F.R. § 1206.104(c) (2016) ....................................................................12

30 C.F.R. § 1206.105 (2016).........................................................................12

30 C.F.R. § 1206.110(f)(2) (2016)................................................................12

30 C.F.R. § 1206.111 (2016).........................................................................19

30 C.F.R. § 1206.141(c)(1)(i) (2016)............................................................19

30 C.F.R. § 1206.141(c)(1)(ii) (2016)...........................................................19

30 C.F.R. § 1206.141(c)(1)(iv) (2016)..........................................................20

30 C.F.R. § 1206.142(d) (2016).....................................................................16

30 C.F.R. § 1206.142(d)(1)(ii) (2016) ...................................................................19

30 C.F.R. § 1206.143 (2016) ................................................................................19

30 C.F.R. § 1206.143 (2016) ................................................................................19

30 C.F.R. § 1206.143(a)(1) (2016) .......................................................................12

30 C.F.R. § 1206.143(c)(2) (2016) .......................................................................12

30 C.F.R. § 1206.144 (2016) ................................................................................12

30 C.F.R. § 1206.152(g)(2) (2016) .......................................................................12

30 C.F.R. § 1206.153(d) (2016) ...........................................................................19

30 C.F.R. § 1206.157(f) (2016) ............................................................................16

30 C.F.R. § 1206.157(g) (2016) ...........................................................................16

30 C.F.R. § 1206.159(c)(2) (2016) .......................................................................18

30 C.F.R. § 1206.159(e)(2) (2016) .......................................................................12

30 C.F.R. § 1206.160(c) (2016) ...........................................................................19

30 C.F.R. § 1206.172(d)(1)(iii) ............................................................................20

30 C.F.R. § 1206.252 (2016) ................................................................................15

30 C.F.R. § 1206.252(b) (2016) ...........................................................................14

30 C.F.R. § 1206.252(b)(1) (2016) .......................................................................14

30 C.F.R. § 1206.252(b)(2) (2016) .......................................................................13

30 C.F.R. § 1206.253 (2016) ................................................................................15

30 C.F.R. § 1206.253(a)(1) (2016) .......................................................................13

30 C.F.R. § 1206.253(c)(2) (2016) .......................................................................12

30 C.F.R. § 1206.253(g) (2016) ...........................................................................19

30 C.F.R. § 1206.254 (2016) .........................................................................12, 15

iv

30 C.F.R. § 1206.260(g)(2) (2016) ......................................................................... 12, 17

30 C.F.R. § 1206.261(c) (2016) .................................................................................... 19

30 C.F.R. § 1206.267(d)(2) (2016) ................................................................................ 12

30 C.F.R. § 1206.268(c) (2016) .................................................................................... 19

30 C.F.R. § 1206.453(c)(2) (2016) ................................................................................ 12

30 C.F.R. § 1206.453(g) (2016) .................................................................................... 19

30 C.F.R. § 1206.460(g)(2) (2016) ................................................................................ 12

30 C.F.R. § 1206.461(c) (2016) .................................................................................... 19

30 C.F.R. § 1206.467(d)(2) (2016) ................................................................................ 12

30 C.F.R. § 1206.468(c) (2016) .................................................................................... 19

30 C.F.R. Part 1241 .......................................................................................................6

52 Fed. Reg. 1,248, 1250 (1988) ................................................................................... 11

52 Fed. Reg. 1,250 ......................................................................................................... 11

52 Fed. Reg. 4,732 (Feb. 13, 1987) ................................................................................9

53 Fed. Reg. 1,184 (Jan. 15, 1988) ............................................................................... 10

53 Fed. Reg. 1,186 ......................................................................................................... 11

53 Fed. Reg. 1,203 ......................................................................................................... 10

53 Fed. Reg. 1,230 ......................................................................................................... 10

53 Fed. Reg. 1,248 ......................................................................................................... 11

53 Fed. Reg. 1,249 ......................................................................................................... 10

54 Fed. Reg. 1,492 (Jan. 13, 1989) ............................................................................... 10

54 Fed. Reg. 1,506 ......................................................................................................... 10

64 Fed. Reg. 43,506 (Aug. 10, 1999) ............................................................................ 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

64 Fed. Reg. 43,515 ................................................................................................. 11

65 Fed. Reg. 14,021 (Mar. 15, 2000) ...................................................................... 11

65 Fed. Reg. 14,022 ................................................................................................. 11

65 Fed. Reg. 14,036 ................................................................................................. 16

65 Fed. Reg. 14,068 ................................................................................................. 11

80 Fed. Reg. 607 (Jan. 6, 2015) .............................................................................. 11

80 Fed. Reg. 608 ..................................................................................................... 11

80 Fed. Reg. 609 ..................................................................................................... 17

80 Fed. Reg. 610 ..................................................................................................... 11

80 Fed. Reg. 24,794 (May 1, 2015) ........................................................................ 11

80 Fed. Reg. 24,801 ................................................................................................. 18

80 Fed. Reg. 24,805 ................................................................................................. 11

80 Fed. Reg. 27,904 ................................................................................................. 11

81 Fed. Reg. 43,338 (July 1, 2016) .......................................................................... 1

81 Fed. Reg. 43,346 ................................................................................................. 16

81 Fed. Reg. 43,340 ................................................................................................. 17

81 Fed. Reg. 43,347 ................................................................................................. 20

81 Fed. Reg. 43,375 ................................................................................................. 12

81 Fed. Reg. 43,383 ................................................................................................. 12

81 Fed. Reg. 43,391 ................................................................................................. 12

82 Fed. Reg. 16,325 (Apr. 4, 2017) .......................................................................... 7

82 Fed. Reg. 36,934 (Aug. 7, 2017) ......................................................................... 1

82 Fed. Reg. 36,944 ........................................................................................... 21, 22

vi

82 Fed. Reg. 36,951 ..................................................................................... 3, 22

Federal Rule of Civil Procedure 41(a)(1)(A)(i) ................................................5

**ADDITIONAL AUTHORITIES**

*A Glossary of Terms Used in the Federal Budget Process, United States Government Accountability Office* (September 2005)...........................................................3

ONRR, Natural Resources Revenue Data, https://revenuedata.doi.gov/explore..................................................3, 21, 22

1

**INTRODUCTION**

2        Plaintiffs California and New Mexico challenge a 2017 final rule issued by the Office of

3   Natural Resources Revenue ("ONRR") regarding valuation for purposes of paying royalties on

4   federal oil and gas production, and on federal and Indian coal production.  82 Fed. Reg. 36,934

5   (Aug. 7, 2017) ("Repeal Rule").  The Repeal Rule rescinded ONRR's 2016 final rule entitled

6   "Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform" ("2016 Rule"),

7   and reinstated its preexisting oil, gas and coal royalty valuation regulations that have been well-

8   established for decades.  81 Fed. Reg. 43,338 (July 1, 2016).  The Repeal Rule was necessary to

9   eliminate major, fatal flaws in the 2016 Rule that ONRR only recently was finally willing to

10  acknowledge.  And, despite Plaintiffs' contrary and baseless rhetoric, the Repeal Rule was neither

11  a "giveaway" to the oil, gas, and coal industries, nor a forfeiture of significant royalty revenue due

12  to ONRR and indirectly to state and local governments.

13        Plaintiffs now ask the Court to resurrect that rescinded 2016 Rule, which even ONRR itself

14  has recognized was fundamentally flawed and unworkable.  Plaintiffs' claims rely on revisionist

15  history, lack support in the administrative record, and, most significantly, ignore the core legal and

16  compliance problems with the 2016 Rule's central provisions.  Plaintiffs and the proposed-

17  intervenor environmental non-governmental organizations ("NGOs") mischaracterize and

18  summarily brush aside the 2016 Rule's failings as a "handful" of peripheral issues easily fixable

19  through subsequent non-binding guidance.  That is because they, unlike the Associations'

20  members and other federal lessees, do not produce oil, gas, or coal, and thus do not have to grapple

21  with compliance or face civil penalties, substantial underpayment interest obligations, or other

22  consequences of noncompliance.  Nor were they privy to the regulated community's growing and

23  repeated requests for compliance assistance, and ONRR's inability to respond, after the 2016 Rule

24  was adopted.  In reality, the Repeal Rule eliminated dysfunctional and nebulous provisions

25  predominant in the 2016 Rule, such as its new forced valuation of coal based on the sales price of

26  an entirely different commodity (electricity), retroactive deprivation of processing allowance

27  approvals expressly authorized by ONRR prior to the 2016 Rule, and creation of regulatory

28

uncertainty by adoption of effectively standardless discretion for ONRR to second-guess lessees' valuation, even for sales of production under arm's-length contracts.  Meanwhile, Plaintiffs blithely refer to the reinstated preexisting regulations as "outdated" based solely on their age, pointing to no specific shortcoming precluding ONRR's successful continuation of three decades of consistent and predictable practice for royalty valuation.

Plaintiffs' claimed "forgone benefits" also are at best insignificant.  Even the economic figures from ONRR's 2016 Rule and Repeal Rule upon which Plaintiffs rely disprove Plaintiffs' hyperbolic loss projections.  For example, Plaintiffs' Complaint and arguments primarily focus on the rescission of new royalty valuation provisions for coal, a resource with no production from federal leases in California and with limited production from federal leases in New Mexico – and, in any event, for which ONRR had predicted no royalty increase from its 2016 Rule.  The biggest projected economic impact, the 2016 Rule's elimination of long-standing offshore deep water subsea transportation deductions for oil and gas, and their reinstatement by the Repeal Rule, also had *no* royalty consequences to the Plaintiffs or any other states.  In the end, the 2017 Repeal Rule projects $15 million less royalty to *all* states with federal oil, gas, or coal operations—and nearly half of that impact is attributable to two oil and gas operations in Wyoming.  As to the proposed-intervenor citizen groups, no royalty impacts accrue from the Repeal Rule; indeed, they lack any concrete, particularized injury as taxpayers even to have Article III standing to maintain this litigation on their own.  And the NGOs' acknowledgement of a "cost increase [to industry] of at most one percent" from the 2016 Rule confirms the corresponding lack of royalty impact from the Repeal Rule.

For the Associations, this case is not about money, but certainty and compliance.  Despite the 2016 Rule's stated goals of "greater simplicity, certainty, clarity, and consistency in product valuation for mineral lessees," it created precisely the opposite result.  The Repeal Rule restored those principles to valuation for royalty purposes of federal oil, gas, and coal and Indian coal.  That is not to say that the preexisting regulations are perfect, or that no future regulatory changes may occur.  Indeed, now no longer facing implementation of an unworkable rule, the agency and

its newly reconstituted Royalty Policy Committee ("RPC") are conducting a more complete and impartial reassessment of whether any changes are needed to its existing rules prospectively.  But these forward-looking actions are separate and independently justified from the 2017 Repeal Rule's immediate need to cure the legal and implementation problems ONRR itself had recently created in the unworkable 2016 Rule.

## BACKGROUND

Rather than duplicate the pertinent background that the Associations expect Federal Defendants will present, the Associations briefly correct Plaintiffs' and NGOs' notable misstatements and omissions regarding the legal and factual background.

As an initial matter, Plaintiffs overstate their vested interest in this case.  It is untrue that of "the billions of dollars" in total annual federal oil, gas, and coal royalties, "[a]pproximately half of these royalties are distributed to the states in which the leases are located," and materially to Plaintiffs.  NGOs' Opening Brief ("NOB"), at 2; *see also* Plaintiffs' Opening Brief ("POB") at 2-3 (claiming "[a] significant portion of this revenue is distributed to states").  Rather, as reflected in both the 2016 Rule and the Repeal Rule, states receive only a share of *onshore* royalties that ONRR collects, and a *de minimis* share of the royalty from offshore production, which constituted more than a third of ONRR's total royalty collections in 2017.  *See* 82 Fed. Reg. at 36,951 (including table of royalty distributions by lease type); DOI Natural Resources Revenue Data, *https://revenuedata.doi.gov/explore*.  Plaintiffs and other states also have no property interest in the mineral production from federal leases within their borders or the royalties paid on that production.  *State of N.M. v. United States*, 11 Cl. Ct. 429 (1986).  All Plaintiffs have under the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 191, is a permanent indefinite appropriation of certain monies after ONRR collects the appropriate royalties and deposits them to the U.S. Treasury.[1]

More specific to this case, none of the western states comprising the vast majority of public

---

[1] *See A Glossary of Terms Used in the Federal Budget Process*, U.S. Government Accountability Office (September 2005), at 22-23, https://www.gao.gov/new.items/d05734sp.pdf.

1   lands and federal mineral production most affected by the Repeal Rule, and that share in the

2   royalty revenues ONRR collects from mineral production on those lands under 30 U.S.C. § 191,

3   has joined Plaintiffs in this litigation.  As detailed *infra*, Plaintiffs chose to file this lawsuit in

4   California despite that it produces *zero* federal coal and very little gas.  And the NGOs have no

5   more royalty interest than any other U.S. citizen.[2]

6          Plaintiffs also omit discussion of the regulatory history pre-dating the 2016 Rule.  But the

7   2016 Rule was not written on a blank slate.  As they concede, the system of royalty valuation was

8   overhauled in 1988 and 1989 following the passage of the Federal Oil and Gas Royalty

9   Management Act, with the first-time adoption of comprehensive rules governing oil and gas

10  valuation and coal valuation, respectively.  *See* POB 4; NOB 3.  The thrust of these changes was to

11  address the very criticisms of the prior federal royalty program that Plaintiffs highlight, principally

12  by providing more certain methodologies based on arm's-length transactions, ensuring full

13  transportation and processing allowances to calculate royalty value at the lease, and removing the

14  agency from routine and unbounded initial valuation determinations.  *See infra* Section I.A.  The

15  2016 Rule, however, arbitrarily turned back the clock on those functioning reforms.

16         The rulemaking process that led to the 2016 Rule was contentious from the start.  The

17  federal and Indian lessee community regarded it as part of an overall prior Administration policy

18  to constrain oil, gas, and coal production from federal and Indian lands by any means, along with

19  other late-in-the-Administration rulemakings targeting those industries.  The 2016 Rule was fueled

20  by unsubstantiated, generalized concerns as well.  Like the 2016 Rule, Plaintiffs rely on a single

21  RPC report issued a decade before the 2016 Rule.  POB 3-4.  But that report's so-called "findings"

22  did not prescribe the problematic provisions ONRR adopted in the 2016 Rule, while steps it did

23

24  ───────────────

25  [2] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 574 (1992) ("We have consistently held that
    a plaintiff raising only a generally available grievance about government—claiming only harm to

26  his and every citizen's interest in proper application of the Constitution and laws, and seeking
    relief that no more directly and tangibly benefits him than it does the public at large—does not

27  state an Article III case or controversy.").  Courts have routinely dismissed citizen taxpayer suits
    for lack of standing.  *E.g., id.*

28

recommend were not adopted, such as clarifying deductible "transportation costs."  *See* POB 4.

The Associations and other affected parties provided voluminous comments on the proposed rule that led to the 2016 Rule, including detailed legal arguments and economic analyses, which they again incorporated by reference in comments on the 2017 Proposed Repeal Rule.  *E.g.*, AR 6621-6677, 8345-48.  Yet, like the 2016 Rule preamble, Plaintiffs misrepresent that ONRR "carefully considered all of the public comments…and, in some instances, revised the language of the final rule based on those comments."  POB 5.  In fact, despite the broad scope and significance of the problems commenters identified, and the changes recommended to ONRR's proposed regulations, the agency made almost no substantive changes between the proposed and final 2016 Rule.  *See* <u>Exhibit 1</u> (comparing the proposed and final 2016 Rule).  It is evident that the agency at the time brushed aside these meritorious comments in an effort to make the new rules applicable to production by January 1, 2017, mere days before the end of the previous Administration.  *See* POB 20 ("Ultimately, the agency decided to implement the reforms despite these alleged complications.").  That conclusion is not lessened by ONRR's unsurprising touting of its rule when issued, as agencies always do.

Lessees' concerns with the attempted revamping of longstanding federal royalty valuation principles were so pervasive that after the 2016 Rule was issued, the Associations and other affected parties filed three separate petitions for review in the U.S. District Court for the District of Wyoming.  AR 3469-90, 3665-72.  The Petitioners challenged the 2016 Rule on the grounds that it was fundamentally flawed and compliance with its new mandates was impracticable or even impossible.[3]  Those cases were stayed while ONRR began the process of reevaluating its 2016 Rule in light of the strength of the claims against it.  After the Repeal Rule issued, the parties voluntarily dismissed those lawsuits without prejudice.  *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

While pursuing relief in Court, lessees in good faith concurrently sought guidance on

---

[3] *Cloud Peak Energy Inc., et al. v. USDOI*, No. 16-315 (D. Wyo. filed Dec. 29, 2016); *API v. USDOI*, No. 16-316 (D. Wyo. filed Dec. 29, 2016); *Tri-State Generation and Transmission Ass'n, Inc., et al. v. USDOI*, No. 16-319 (D. Wyo. filed Dec. 29, 2016).

1  interim compliance in the run-up to and even after January 2017, the first scheduled oil, gas, and

2  coal production month to be reported under the 2016 Rule.  Plaintiffs and the NGOs cite ONRR

3  offers of "guidance and trainings," but fail to mention that the agency was unable to provide

4  meaningful guidance on the contentious issues.  *E.g.*, POB 6; NOB 11.  As evidenced by their

5  sparse citations of administrative record documents, these communications produced more

6  unanswered questions than solutions, often merely parroted the regulations, or reflected confusion

7  even within the agency.  *See, e.g.*, 3422-35 (continued agency delay despite repeated requests for

8  guidance), AR 10183 (failing to answer company's question), 1227 (referring back to the 2016

9  Rule itself); *Becerra v. USDOI*, 276 F. Supp. 3d 953 (N.D. Cal. 2017) ("trainings revealed some

10  confusion about the Rule…ONRR responded that it could not provide guidance before the January

11  1, 2017 effective date and could not guarantee guidance by the end of February").  Yet this

12  widespread uncertainty on the core aspects of the 2016 Rule did not alter the impending

13  compliance burden on the Associations' members representing all aspects of America's coal, oil,

14  and gas industries.  ONRR's separate yet concurrent expansion of its 30 C.F.R. Part 1241 civil

15  penalty regulations for alleged noncompliance only raised the stakes.[4]

16      The change in administration precipitated the first unvarnished look at the 2016 Rule and

17  its impending compliance obstacles.  Its inability to provide actionable guidance served as a

18  vehicle to highlight for the agency the 2016 Rule's fundamental defects as commenters had

19  previously warned.  While it reassessed the Rule, ONRR issued a notice of suspension pursuant to

20  5 U.S.C. § 705 because it "f[ound] that justice so requires."[5]  Then ONRR conducted a full

21  rulemaking reevaluating the 2016 Rule, which yielded the Repeal Rule in August 2017.  The

---

[4] That civil penalty rule is presently being challenged in federal district court as arbitrary and
capricious and *ultra vires*.  *API v. USDOI*, No. 17-83 (D. Wyo., filed May 11, 2017).

[5] Attempts to bootstrap *Becerra* invalidating the prior temporary suspension fail because it was
premised on a statutory interpretation of 5 U.S.C. § 705, an issue irrelevant to this case involving a
permanent repeal.  POB 1 n.1; NOB 10 (citing *Becerra v. USDOI*, 276 F. Supp. 3d 953 (N.D. Cal.
2017).  *Becerra* directed the agency to engage in rulemaking, and ONRR has done exactly that
with the Repeal Rule.  Moreover, *Becerra* denied Plaintiffs' request to reinstate the 2016 Rule in
light of the impending Repeal Rule.

agency complied with all notice-and-comment procedures over the course of several months.[6]  The 2016 Rule has never taken effect for any reporting month, thus ensuring certainty and consistency.

The Repeal Rule is not the end of the issue.  The government currently is considering potential amendments to the reinstated royalty valuation.  *See* 82 Fed. Reg. 16,325 (Apr. 4, 2017). This process will be informed by upcoming recommendations of the recently reconstituted RPC comprised of diverse stakeholders, including industry and the states.  *See* AR 5089-91; ECF No. 1 ¶ 34.  These steps – *not* reinstatement of the 2016 Rule even the expert agency now acknowledges is dysfunctional – will ensure ONRR is "fulfilling its statutory mandates impartially and competently."  *See* POB 21.

## STANDARD OF REVIEW

To avoid duplication, the Associations incorporate by reference Federal Defendants' discussion of the applicable standard of review.

## ARGUMENT

Plaintiffs invent a false narrative that the 2017 Repeal Rule challenged in this case constituted a "giveaway" to industry and deprived states and taxpayers of significant royalty revenues.  The reality is the Repeal Rule was ONRR's most prudent action to cure the agency's ill-advised, and previously litigated, 2016 Rule.  And any consequences to Plaintiffs due to the Repeal Rule are negligible.

## I.   ONRR PROPERLY REPEALED THE LEGALLY AND PRACTICALLY FLAWED 2016 RULE.

The detailed comments the Associations and others filed with ONRR, and the difficulties with implementing the new rules that lessees brought to ONRR's attention during the initial compliance period preceding January 1, 2017, highlighted the inherently problematic nature of the 2016 Rule.  As the Associations have explained, and ONRR has now recognized in the Repeal

---

[6] Plaintiffs' procedural claims ring hollow because (1) they do not allege their comments were omitted from the present record, and (2) they are internally contradictory – ONRR's solicitation of public comments could not have been too vague and overly narrow.

Rule, the 2016 Rule exceeded ONRR's statutory authority; made impossible demands on lessees, requiring royalty calculations infeasible to perform and information impossible to obtain; and created arbitrary "discretion" by ONRR to unilaterally establish royalty value.  In short, the 2016 Rule achieved the opposite of its stated goal to provide "greater simplicity, certainty, clarity, and consistency in product valuation for mineral lessees."  81 Fed. Reg. at 43,338.  The Repeal Rule was necessary to restore the workability of ONRR's royalty valuation regulations and decades of consistent agency interpretations on which industry had reasonably come to rely.

Through this action, Plaintiffs cannot ask this Court to affirm the 2016 Rule or reject the rules previously in effect that were altered by that Rule.  The only issue before the Court is the validity of the Repeal Rule.  Yet that issue requires understanding the previous rules and the 2016 Rule's substantial and unwarranted changes thereto.

## A.  For Three Decades ONRR Pursued More Certainty in Royalty Valuation.

Lessees of oil, gas, and coal on federal lands are required to pay to the Secretary of the Interior a royalty based on the percentage specified in the lease of the "value" of production.  30 U.S.C. §§ 207 (coal), 226(b) (oil and gas).  The statute does not specify how that value for royalty purposes is to be calculated.  Regulations applicable to the valuation of production from federal leases were originally issued by the U.S. Geological Survey ("USGS"), predecessor to the Minerals Management Service ("MMS"), in turn ONRR's predecessor agency.  The original oil and gas valuation regulations were one paragraph in length and were not prescriptive for lessees, instead reserving broad discretion to the agency to determine the royalty value.[7]  *See Mobil Oil*

---

[7] The oil and gas royalty valuation regulations at 30 C.F.R. § 206.103, in effect through 1987 provided (emphasis added):

**§ 206.103 Value basis for computing royalties.**

The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product *as determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters….*

*Expl. Co.*, MMS-86-0016, 1987 WL 1447298 (June 29, 1987), at \*2 (pre-1988 regulations authorized MMS to determine royalty valuation).  For coal leases, the regulations similarly reserved considerable discretion to the agency to determine royalty value.  30 C.F.R. § 203.200 (1985).  Lessees would initially report a royalty value consistent with the regulations, but there was no assurance the agency would accept that value.

In 1986, the Secretary of the Interior convened a Royalty Management Advisory Committee composed of representatives from industry, states, Indian Tribes, and MMS.  *See* 52 Fed. Reg. 4,732 (Feb. 13, 1987).  With the Committee's support, MMS in 1987 began the process of overhauling its oil and gas and coal royalty valuation regulations for production from federal and Indian leases.  A primary purpose for the regulatory reform was to create certainty in the royalty valuation process which, until that time, was left to agency discretion and was unpredictable and frustrating to lessees, particularly when they received large audit bills for additional royalties and substantial late payment interest[8] months or years after the production occurred.  *See id.* at 4,735.  MMS chose to constrain its broad discretion from the old regulations to determine value, and adopted a new valuation system that would "allow[] the lessee certainty in determining its own value without dependence upon MMS to establish the value."  *Id.* at 4,735; *see* 53 Fed. Reg. 1,248 (Jan. 15, 1988) (same).

Reflecting the effort to create certainty under regulations that rely primarily on arm's-length contracts in the area where the production occurred to determine value, under the 30 C.F.R. Part 206 regulatory system adopted for oil and gas in 1988, and coal in 1989, if a lessee disposed of its production pursuant to an arm's-length contract, the contract price conclusively determined value.[9]  For production not disposed of pursuant to an arm's-length contract, MMS adopted a hierarchical set of "benchmarks" for determining value, applied in descending order.  The first benchmark was based largely on comparing the lessee's non-arm's-length contract price for that

---

[8] *See* 30 U.S.C. § 1721(a).
[9] *See* 30 C.F.R. § 206.152(b)(1) (1988) (gas); 30 C.F.R. § 206.102(b)(1) (1988) (oil); and 30 C.F.R. § 206.257(b) (1989) (coal).

particular transaction to the lessee's or other comparable arm's-length contract prices for purchases and sales in the same area.[10]   Additional benchmarks allowed reliance on other market-reflective prices such as other arm's-length sales prices, index prices, posted prices, and other publicly available indicia of prices in the area where the production occurred.   The least favored benchmark was a net-back value,[11] starting with a value at a location distant from the lease where the production occurred and deducting transportation and other allowable costs to determine a net value at the lease location.

---

[10] *See* 30 C.F.R. § 206.152(c) (1988) (gas); § 206.102(c) (1988) (oil); and § 206.257(c)(2) (1989) (coal).  The benchmark valuation regulation for gas sold pursuant to a non-arm's-length contract is illustrative:

"(c) The value of gas subject to this section which is not sold pursuant to an arm's-length contract shall be the reasonable value determined in accordance with the first applicable of the following methods:

(1) The gross proceeds accruing to the lessee pursuant to a sale under its non-arm's-length contract (or other disposition other than by an arm's-length contract), provided that those gross proceeds are equivalent to the gross proceeds derived from, or paid under, comparable arm's-length contracts for purchases, sales, or other dispositions of like-quality gas in the same field (or, if necessary to obtain a reasonable sample, from the same area). In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: price, time of execution, duration, market or markets served, terms, quality of gas, volume, and such other factors as may be appropriate to reflect the value of the gas;

(2) A value determined by consideration of other information relevant in valuing like-quality gas, including gross proceeds under arm's-length contracts for like-quality gas in the same field or nearby fields or areas, posted prices for gas, prices received in arm's-length spot sales of gas, other reliable public sources of price or market information, and other information as to the particular lease operation or the saleability of the gas; or

(3) A net-back method or any other reasonable method to determine value."

[11] *See, e.g.*, 54 Fed. Reg. 1492, 1506 (Jan. 13, 1989) ("The MMS will use a net-back valuation method only when other methods of determining value, such as those specified in the rules, are inapplicable."); 53 Fed. Reg. 1184, 1186 (Jan. 15, 1988) ("To routinely perform labor-intensive net-back calculations is impractical."); *id*. at 1203 ("the other benchmarks which have higher priority will result in a reasonable value for royalty purposes and obviate the need to undertake a labor-intensive net-back method"); 53 Fed. Reg. 1230, 1249 (Jan. 15, 1988) ("MMS agrees that the net-back method will not be used frequently . . . . The net-back analysis *should only be used where less complex procedures are not feasible*") (emphasis added).   By way of illustration, a netback process could begin for coal production from a lease in the Powder River Basin in Wyoming at a market center on the West Coast or in Asia.  From that point, it is a complex process to determine a reduction against that distant value to reflect the costs and risks incurred to move the coal production from Wyoming to that market point.

1    In the 1988 preamble to the final rule adopting these benchmark provisions that rely

2 primarily on arm's-length sales prices and publicly-available spot market and index prices in the

3 area where the production occurred, MMS confirmed that "[this new] system allows the lessee

4 some certainty in determining its own value without dependence upon MMS to establish the

5 value," and that "MMS is satisfied that ultimately the lessee will be able to determine the proper

6 royalty value for its gas."  53 Fed. Reg. at 1,248, 1,250.  MMS also affirmed its intent to create a

7 valuation system based primarily on prices paid under arm's-length contracts.  53 Fed. Reg. at

8 1186 ("The MMS believes that gross proceeds under arm's-length contracts are representative of

9 market value.").

10    The federal gas valuation regulations and federal and Indian coal valuation regulations

11 remained largely unchanged since their adoption in 1988 and 1989, respectively.  The federal oil

12 valuation regulations were amended in 2000 to adopt an index-based valuation methodology in

13 lieu of benchmarks for non-arm's-length dispositions because the NYMEX price and Alaska North

14 Slope price had become reliable index-based methods to value crude oil production.  65 Fed. Reg.

15 14,021, 14,022, 14,068 (Mar. 15, 2000).  The Indian gas valuation regulations were amended in

16 1999, 64 Fed. Reg. 43,506, 43,515 (Aug. 10, 1999), and the Indian oil valuation regulations were

17 amended in 2015, 80 Fed. Reg. 24,794, 27,904, 24,805 (May 1, 2015), to reflect more reliance on

18 index values and certain royalty valuation terms unique to Indian oil and gas leases.

19    **B.  The 2016 Rule Re-Created Broad Uncertainty for Lessees.**

20    Any "reversal of course" alleged by Plaintiffs more aptly describes the 2016 Rule than the

21 2017 Repeal Rule.  *See, e.g.*, POB 2.  Contrary to its stated objectives, the 2016 Rule upended the

22 certainty and reliance on arm's-length contracts so critical to royalty valuation and re-instituted the

23 broad agency discretion that was so disturbing to both the agency and the lessees in the mid-1980s.

24 ONRR admitted this purpose in the preamble to the 2015 Proposed Rule, claiming "considerable

25 discretion to establish the reasonable value of production using a variety of discretionary factors

26 and any other information the Secretary believes is appropriate."  80 Fed. Reg. 607, 608, 610 (Jan.

27

28

6, 2015).  In comments on the 2015 Proposed Rule, the Associations and others such as the

Council of Petroleum Accountants Societies described in detail how the offending provisions

would eliminate the certainty in the valuation process so vital to lessees, and in many instances

render the valuation regulations unworkable.  As explained above, the last Administration

shrugged off these concerns, adopting the regulation almost *exactly* as proposed.  *See* Exhibit 1.

Emblematic of the 2016 Rule's true purpose were its "default provisions" whereby in lieu

of ordering lessee corrections, the agency unilaterally could "decide[] to value your" oil, gas, or

coal.  *See* 81 Fed. Reg. at 43,375, 43,383, 43,391 (§§ 1206.105, 1206.144, 1206.254 (2016)).  The

criteria for such ONRR valuation were substantially the same discretionary provisions as in the old

30 C.F.R. § 206.103 (1987) regulations.[12]  ONRR's plain purpose in the 2016 Rule was to turn

back the clock 30 years and reinstitute broad agency discretion to establish royalty value.

Further exacerbating the renewed uncertainty for lessees were the 2016 Rule's many

triggers for the "default provision" pervading the oil, gas, and coal regulations.[13]  For example, if

ONRR determined for any reason that the lessee's reported value was "inconsistent" with the

regulations," ONRR could "decide your value."  §§ 1206.104(a)(1), 1206.143(a)(1),

1206.253(a)(1) (2016).  Or if a lessee's reported royalty value was "10 percent less than the lowest

reasonable measures of market price," then ONRR could reject the lessee's value and substitute its

---

[12] Moreover, under the default provision for coal at § 1206.254, ONRR could use valuation criteria nearly identical to the criteria that were in the 1989 rule's benchmarks that the 2016 Rule had eliminated, including "[t]he value of like-quality coal from the same mine, nearby mines, the same region, other regions, or washed in the same or nearby wash plant," "public sources of price or market information," or "any other information that ONRR deems relevant."  It defies reason that ONRR reserved to itself the ability to use such readily available and well-accepted standards for coal valuation, yet deprived the lessees of the same opportunity, claiming that the prior benchmarks were ineffective to determine value.

[13] *See* § 1206.104(c) (oil); § 1206.110(f)(2) (oil transportation allowance); § 1206.143(c)(2) (gas); § 1206.152(g)(2) (gas transportation allowance); § 1206.159(e)(2) (gas processing allowance); § 1206.253(c)(2) (federal coal); § 1206.260(g)(2) (federal coal transportation allowance); § 1206.267(d)(2) (federal coal washing allowance); § 1206.453(c)(2) (Indian coal); § 1206.460(g)(2) (Indian coal transportation allowance); and § 1206.467(d)(2) (Indian coal washing allowance) (2016).

1   own value.[14]  These provisions were facially circular and the essence of arbitrary and capricious

2   because ONRR reserved to itself the determination of the "lowest reasonable" value.  The default

3   provision could apply even if a lessee sold its production under a perfectly valid arm's-length

4   contract.  As another example, a lessee of coal that is never sold, or which is consumed in a power

5   plant to create electricity that is not sold at arm's-length, or for which despite a lessee's best efforts

6   "ONRR determines that your reported value is inconsistent with the requirements of this subpart,"

7   would have no option to avoid the default provision.  §§ 1206.252(b)(2), 1206.253(a)(1) (2016).

8   As regulated entities, lessees "are entitled to know the rules by which the game will be played."

9   *United States v. AMC Entm't Inc.*, 549 F.3d 760, 768 (9th Cir. 2008) (internal citation omitted);

10  see also *Gen. Elec. Co. v. USEPA*, 53 F.3d 1324, 1333-34 (D.C. Cir. 1995).  Therefore, ONRR's

11  rescission of these default provisions was proper.

12  **C.   Core Provisions of the 2016 Rule Were Irreparably Broken.**

13      ONRR adopted certain provisions in the 2016 Rule that were ill-conceived and often so

14  defective that there was no way a lessee could comply with their requirements.  These provisions

15  included requiring valuation of coal based on the sales price of electricity generated by the coal;

16  requiring lessees to pay royalty on an affiliate's downstream sale of coal with inadequate

17  provisions for a transportation allowance; imposing fixed caps on transportation and processing

18  allowances in contravention of well-established principles making such caps unlawful; requiring

19  that all contracts and contract amendments be in writing; requiring royalties for gas production

20  based on unattainable index prices; reversing retroactively a decades–old policy that subsea

21  movement of deep water Outer Continental Shelf ("OCS") production was a deductible

22  transportation cost; and a fixed location differential for gas valuation based on a process adopted

23  nearly 20-years earlier.  These are not tangential problems that, as Plaintiffs repeatedly suggest,

24

25  [14] For allowances deductible from value, such as transportation costs, the 2016 Rule included the
    same circular standard that ONRR could consider an allowance "unreasonably high if it is 10
26  percent higher than the highest reasonable measures of transportation costs . . . ," with ONRR
27  again the sole arbiter of what is "reasonable."  *See, e.g.*, §§ 1206.110(f)(2) (oil), 1206.152(g)(2)
    (gas), 1206.260(g)(2) (coal) (2016).
28

1  ONRR could have fixed with guidance.

2        <u>Requirement to value coal based on the sales price for generated electricity.</u>  The prime

3  example of a 2016 Rule provision inoperative from its inception was § 1206.252(b).[15]  Under the

4  longstanding prior regulations, if a federal lessee did not sell its coal production arm's-length, the

5  lessee valued its coal under the "benchmarks," with initial reliance on comparable arm's-length

6  sales prices for coal in the field or area where the coal is produced.  The 2016 Rule eliminated the

7  benchmarks and required that if a lessee or its affiliate used coal production from a federal lease in

8  a power plant to generate electricity, and the lessee or the affiliate sold the electricity that was

9  generated, then the royalty owed was based on the "gross proceeds accruing to you for the power

10  plant's arm's-length sales of the electricity less . . . transmission and generation deductions

11  determined under §§ 1206.353 and 1206.354."  *See* § 1206.252(b)(1) (2016).  This provision was

12  illegal and unworkable on many levels.

13        As an initial matter, ONRR's MLA authority to value coal production does not permit it to

14  base that value on the sales price for a distinct commodity that is subject to completely different

15  market forces and regulated pricing regimes.  In particular, the MLA imposes a royalty "of not less

16  than 12 ½ per centum of the value of *coal*."  30 U.S.C. § 207(a) (emphasis added).  ONRR

17  nowhere explained how that prescribed royalty rate was transferable to *electricity,* an entirely

18  different commodity with a completely different pricing structure than coal.  Therefore, this

19  provision was facially inconsistent with the governing statute and was legally fatal to the 2016

20  Rule.[16]  Indeed, for federal oil production under the MLA, the agency previously held that royalty

21

22  [15] The 2016 Rule provisions included in the federal coal valuation regulations, §§ 1206.250-.273,

23  are the same as for Indian coal leases in §§ 1206.450-.473.  Therefore, all of the references to

24  issues with the federal coal regulations addressed herein relate equally to the corresponding
provisions of the Indian coal regulations.

25  [16] ONRR's valuation of geothermal steam resources on federal lands based on the sales price of
*electricity* generated therefrom required a statutory amendment to the royalty provisions of the

26  Geothermal Steam Act.  Energy Policy Act of 2005, P.L. 109-58 (Aug. 8, 2005); 30 U.S.C. §
1004(a).  When it made that change to the valued commodity, Congress also reduced the royalty

27  rate range from 10 to 15 percent to 1 to 5 percent.  *Id.*  Congress also gave lessees the choice
whether to come under the new valuation scheme.  P.L. 109-58 § 224(e).  Congress made no such

28

1   could not be assessed on the value of electricity generated therefrom.  *Petro-Lewis Corp.*, 108

2   IBLA 20, 1989 WL 255495 at \*10-11 (1989).

3         Second, there is no identifiable "the electricity" generated by the coal.  A particular ton of

4   coal and sales of generated electric power cannot be correlated.  Coal used at a power plant may be

5   stockpiled for months or even years, and may be comingled at the power plant with coal of

6   different quality or from other sources when it ultimately is consumed.  Also, electricity generated

7   from multiple sources, including gas-fired plants, wind facilities and solar facilities, often is

8   comingled with the power generated from a coal plant before the electricity is sold.  Further, in

9   many cases the first sale of the electricity may be at the retail or residential level, making the

10  accounting ONRR required effectively an impossibility for a coal lessee that may be unable to

11  obtain that level of detailed and proprietary information for consumer electricity purchases.

12  Finally, ONRR took a shortcut by incorporating the transmission and generating deduction

13  regulations applicable to geothermal resources in 30 C.F.R §§ 1206.353 and 1206.354, regulations

14  not even within the scope of the recent rulemaking effort, with absolutely no demonstration by the

15  agency of the comparability between geothermal and coal-fired power plants and transmission

16  facilities.  NMA and individual companies raised these concerns prior to and after the final 2016

17  Rule, yet ONRR made no changes prior to the Repeal Rule.  *E.g.*, AR 6678-83, 8345-8348.  As

18  explained above, when asked by lessees for assistance, even ONRR could provide no guidance on

19  how to make this provision (or several others) work.  *E.g.*, AR 3422-35.  Therefore, ONRR's 2017

20  rescission of this provision was not only reasonable but also necessary to reinstate the workable

21  benchmarks for lessees to value their coal production not sold arm's-length.

22        <u>Improper treatment of downstream coal sales by affiliates.</u>  ONRR's other efforts in the

23  2016 Rule to eschew the benchmarks for valuation of coal transferred from a lessee to its affiliate

24  are equally arbitrary and legally suspect.  Under § 1206.252 of the 2016 Rule, if a lessee sold its

25  coal production to its affiliate, and the affiliate subsequently sold the production under an arm's-

26  ──────────────

27  changes for coal, and ONRR exceeded its delegated authority when it substituted electricity for

coal in the 2016 Rule.

28

length sale, the lessee had to pay royalty on the affiliate's sales price.  But ONRR provided no exception to the requirement to chase gross proceeds to the affiliate's resale, no matter where that sale occurred, and no matter how complex it might be to trace the coal through multiple transactions to that first sale.  In contrast, for oil valuation, recognizing the complexities inherent in potentially tracing through multiple transactions to reach the first arm's-length sale, ONRR provides lessees the option of using an index-based value instead of chasing the affiliate's resale gross proceeds.  30 C.F.R. § 1206.102(d)(2)(i).[17]  For gas valuation, ONRR in the 2016 Rule included the same index-based option instead of chasing gross proceeds.  *Id.* § 1206.142(d) (2016).  ONRR arbitrarily treated coal lessees differently than oil and gas lessees by requiring that they chase their affiliate's gross proceeds no matter where the sale may occur, and with no reasonable alternative.

A separate problem is that in limited instances the coal affiliate's first arm's-length sale may occur far from the area where production occurred, even overseas.  Yet, despite requiring lessees to chase the affiliates gross proceeds, in the 2016 Rule ONRR failed to correspondingly revise its transportation allowance regulations to provide lessees with details on what costs would be allowable in determining the value when the first sale occurs so far from the lease.  The ONRR coal transportation allowance rules nowhere address costs associated with long distance transportation, and are devoid of any provisions addressing allowable costs relating to ocean transportation of coal.  In contrast, the preexisting regulations and 2016 Rule (§§ 1206.157(f) and (g)) provided detailed guidance on what costs are or are not allowable in determining gas transportation allowances.  Absent such detail, coal lessees would have been at risk of not receiving the full transportation allowance to net the value back to the lease, violating the cardinal

---

[17] In the 2000 oil rule preamble, MMS explained that "many industry comments claimed that tracing multiple exchanges would be overly burdensome….  As a result…in the final rule MMS is providing an option to use either the arm's-length gross proceeds following one or more arm's-length exchanges, or the provisions of § 206.103 [index price, etc.]."  65 Fed. Reg. at 14,036.  Likewise for gas, in the 2016 Rule, ONRR found that "[t]he index-based option provides a lessee with a valuation option that is simple, certain, and avoids the requirements to unbundle fees and 'trace' production." 81 Fed. Reg. at 43,346.

1    principle of valuation at the lease.  *See* 80 Fed. Reg. at 609 ("the Department reaffirms that the

2    value, for royalty purposes… is determined at or near the lease").  Lessees also would have been at

3    risk that ONRR would challenge or reject its claimed allowances, permitting ONRR to unilaterally

4    determine the transportation allowance under the default provision per § 1206.260(g)(2).  That is

5    why ONRR and its predecessors historically considered a net-back process to be the least desirable

6    valuation option.

7         <u>Treatment of subsea movement of bulk deep water production as non-deductible gathering.</u>

8    The issue of most concern to OCS oil and gas lessees was the 2016 Rule's amendment to the

9    definition of "gathering" in § 1206.20.  ONRR's sudden reversal of its established 1989 Deep

10   Water Policy, now treating all subsea movement of bulk deep water production as non-deductible

11   "gathering" rather than deductible "transportation," ignored any relevant facts such as the long

12   distances traveled (as much as 50 miles) and the relative paucity of deep water surface facilities.

13   Lessees undertook the risk and expense and paid higher bonuses to develop deep water oil and gas

14   resources since 1989 in reliance on ONRR's existing, well-reasoned deep water policy explaining

15   that much of the movement of oil and gas from subsea manifolds to distant platforms constituted a

16   deductible transportation cost.  *See* AR 6628-29, 6631-33.

17        ONRR's only response to the comments on this issue was that "[t]he former Minerals

18   Management Service intended for the Deep Water Policy to incentivize deep water leasing by

19   allowing lessees to deduct broader transportation costs than the regulations allowed.  ONRR

20   concluded that the Deep Water Policy has served its purpose and is no longer necessary."  81 Fed.

21   Reg. at 43,340.  What this response utterly ignores is that it will take OCS lessees years, if not

22   decades, to recover the costs for building the existing deep water production systems the 1989

23   policy incentivized them to build.  In addition to the agency improperly ignoring the reality that

24   this subsea movement is transportation and not what is traditionally considered gathering, it was

25   legally indefensible for the agency to dangle an incentive for a lessee to expend money with the

26   expectation of recovering the cost over time, and then for the agency to yank the incentive

27

28

1   midstream and prevent that recovery for monies already invested.[18]

2       Imposition of fixed allowance caps as a percentage of the sales price.  The 2016 Rule

3   arbitrarily capped deductible transportation and processing allowances (respectively, at 50% and

4   66.66% of the value of oil and gas/natural gas liquids) despite that some operations actually incur

5   higher reasonable, actual transportation or processing costs fully justifying higher allowances,[19]

6   and terminated any existing approvals of higher allowances under the preexisting regulations.

7   These new caps were arbitrary and capricious.  As ONRR admitted in proposing the 2016 Rule,

8   the value for royalty purposes of production from federal oil and gas leases must be established at

9   or near the lease.  80 Fed. Reg. at 609 ("the Department reaffirms that the value, for royalty

10  purposes, of crude oil and natural gas produced from Federal leases… is determined at or near the

11  lease").  Value at the lease is achieved by reducing the sales price at a distant market by the *full*

12  transportation cost of moving production from the lease to that market, and by allowing lessees to

13  reduce the enhanced value of post-processing products of a gas stream by the *full* costs of

14  processing.  The arbitrary caps violated this principle by reducing the otherwise permissible

15  allowance necessary to achieve value "at or near the lease."  Also, contrary to the agency's 2016

16  Rule, one year earlier ONRR issued a final Indian oil regulation affirmatively rejecting imposition

17  of the very same allowance caps.  80 Fed. Reg. at 24,801 (May 1, 2015) ("The final rule retains a

18  lessee's ability to request approval to exceed the 50-percent limitation on transportation

19  allowances.").  ONRR thus was justified in removing these arbitrary allowance caps in the 2017

20  Repeal Rule.

21      Requirement that contracts and contract amendments be written.  Similarly arbitrary was

22

23  [18] *See, e.g., Landgraf v. Usi Film Prods.*, 511 U.S. 244, 264 (1994) ("[R]etroactivity is not favored
    in the law.") (quoting *Bowen v. Georgetown Mem. Hosp.*, 488 U.S. 204, 208 (1988)); *Republic of
24  Austria v. Altmann*, 541 U.S. 677, 693 (2004) ("these antiretroactivity concerns are most pressing
    in cases involving new provisions affecting contractual or property rights, matters in which
25  predictability and stability are of prime importance") (internal quotations omitted); *id*. at 696
    ("The aim of the presumption is to avoid unnecessary post hoc changes to legal rules on which
26  parties relied in shaping their primary conduct.")
    [19] See §§ 1206.110(d)(1) (oil transportation allowance), 1206.152(e)(1) (gas transportation
27  allowance), and 1206.159(c)(2) (gas processing allowance) (2016).

28

ASSOCIATIONS' CROSS-MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT
Case No. 4:17-cv-5948-SBA

the 2016 Rule's blanket rejection of contractual agreements not fully written and signed by all parties, and substitution of ONRR's default provision.[20]  This mandate defied any logic in the modern business environment, and was directly inconsistent with the 2016 Rule's own definition of "contract" in § 1206.20.   That definition continued ONRR's longtime regulatory definition of "contract" as "*any oral* or written agreement, including amendments or revisions, between two or more persons, that is enforceable by law and that, with due consideration, creates an obligation" (emphasis added).  The requirement that any contract, *or revision*, must be written and signed by the parties to have effect for royalty valuation purposes also ignored contemporary business transactions in the energy industry that are fast-moving, often instantaneous, and electronic.  *See, e.g.,* AR 6638, 6640-41.  These agreements are as legally binding as formal written contracts with signatures.  For ONRR to provide in the 2016 Rule that in the event of such transactions "ONRR may determine your value" is simply one more effort to eliminate the certainty of arm's-length contracts from the regulations and instead subject lessees to the valuation whims of the agency.

Payment of royalty on unattainable index prices.  The 2016 Rule's gas valuation provisions also *required payment of royalty on a price that the lessee could not actually obtain for its gas,* another instance of unlawful agency overreach.  Industry generally supported the use of available index prices for valuation of production not sold at arm's-length, or as an available alternative to chasing an affiliate's resale gross proceeds.  However, under §§ 1206.141(c)(1)(i) (unprocessed gas) and 1206.142(d)(1)(i) (processed gas), for gas that can be transported to only one index pricing point, ONRR had extracted an arbitrary premium by requiring use of the "*highest* reported monthly bidweek price for that index pricing point (e.g. market center) for the production month" (emphasis added), in lieu of an average or median price for the month.  *See also* AR 6634-38, 6674.

Even more offensive, under §§ 1206.141(c)(1)(ii) (unprocessed gas) and 1206.142(d)(1)(ii)

---

[20] § 1206.103(g) (oil); § 1206.111(d) (oil transportation); § 1206.143 (gas); § 1206.153(d) (gas transportation); § 1206.160(c) (gas processing); §§ 1206.253(g), 1206.453(g) (federal, Indian coal); §§ 1206.261(c), 1206.461(c) (federal, Indian coal transportation); §§ 1206.268(c), 1206.468(c) (federal, Indian coal washing) (2016).

1   (processed gas), for gas that can be transported to more than one index pricing point, value was set

2   at "the highest reported monthly bidweek price for the index pricing points to which your gas

3   *could* be transported for the production month, *whether or not there are constraints*, for that

4   production month." (Emphasis added.)  Thus, if a lessee actually sold all of its gas at index price

5   point A, but there was a pipeline to index pricing point B that had a higher index price, it must pay

6   royalty on the point B price even if there was no capacity in the pipeline to physically transport its

7   gas to point B.  This "pay royalty on the highest price available anywhere standard" violated the

8   MLA requirement that a lessee pay royalty on the value of *its* production and could not stand.

9        <u>Arbitrary location differential for index values.</u>  For lessees that paid royalty on an index

10   price for gas, § 1206.141(c)(1)(iv), the 2016 Rule included a fixed location differential provision

11   to account for the difference in value for gas at the lease versus the market center where the index

12   price is established (to support the "value is determined at the lease" concept).  Under this section,

13   lessees were to reduce the index price "by 5 percent for sales from the OCS Gulf of Mexico and by

14   10 percent for sales from all other areas, but not by less than 10 cents per MMBtu or more than 30

15   cents per MMBtu."  In comments, API noted the lack of justification for this fixed adjustment

16   factor.  AR 6637-38.  The only apparent support was that it was the same location adjustment

17   factor provided for gas valuation under Indian gas leases in ONRR regulations adopted *17 years

18   earlier*.  *See* 30 C.F.R. § 1206.172(d)(1)(iii).  In the 2016 Rule, ONRR provided no response as to

19   how this factor remained reasonable for leases not on Indian lands, particularly for leases on the

20   OCS, other than an unsupported, self-serving statement that based on "transportation rate data"

21   ONRR analyzed, the fixed adjustments are "a reasonable reduction to the index price."  81 Fed.

22   Reg. at 43,347.  ONRR's decision to rescind this provision again was justified because it was

23   arbitrary and unsupported.

24        Contrary to Plaintiffs suggestion, the above legal and practical problems with the 2016

25   Rule, and several other regulatory defects identified in the Associations' comments on the

26   Proposed 2015 Rule and included in their comments on the Repeal Rule, AR 6621-23, 8345-48,

27   were not susceptible to an easy fix via agency guidance or other non-regulatory means.  Therefore,

28

ASSOCIATIONS' CROSS-MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT
Case No. 4:17-cv-5948-SBA

1    repealing the 2016 Rule, and reinstituting the previous workable and legally compliant valuation

2    rules, was a proper response from ONRR.

3    **II.    THE REPEAL RULE DID NOT FORFEIT ANY MATERIAL BENEFIT.**

4          Plaintiffs' entire argument relies on the flawed premise that the Repeal Rule surrendered

5    "significant" funds that otherwise would have been paid by lessees to Plaintiffs and other states.

6    Plaintiffs assert that "[t]he agency also failed to explain its decision to favor the financial interests

7    of lessors over those of the public . . ." and that "ONRR admits that the Repeal costs state and

8    local governments, Indian lessors and the federal government 'an estimated annual decrease in

9    royalty collections between $60.1 million and $74.8 million.'"  POB 16.  However, Plaintiffs fail

10    to put the revenue impact into the context of the overall ONRR royalty collection scheme, ignore

11    the likelihood that ONRR would not have succeeded in collecting the additional revenue had the

12    2016 Rule not been rescinded, and in particular overstate the revenue impacts to the Plaintiffs.

13          The Associations' objections to the 2016 Rule had everything to do with certainty of royalty

14    obligations, and eliminating provisions from the regulations that failed to adhere to well-

15    established royalty valuation concepts or were effectively impossible to meet.  In terms of the total

16    annual revenues ONRR collects from oil, gas, and coal development on federal and Indian lands,

17    any additional revenues lessees may have been required to pay were nominal.  Correspondingly,

18    any real impacts to Plaintiffs or other federal, state, and local recipients also were nominal, at best.

19          The $60.1-74.8 million projected fiscal impact from the Repeal Rule's changes to the 2016

20    Rule, set forth in the Summary of Royalty Impacts to Industry in the preamble to the Repeal Rule,

21    amounts to a potential overall impact from the Repeal Rule of only 0.8-1 percent of ONRR's total

22    royalty collections from oil, gas and coal production on federal lands and the OCS.  82 Fed. Reg.

23    at 36,944.  To put that number in perspective, in Fiscal Year 2017, ONRR collected more than $5

24    *billion* ($5,742,298,962) in total royalty.  *See* https://revenuedata.doi.gov/explore.

25          ONRR's public revenue data demonstrates that the potential revenue impacts to the

26    Plaintiffs from the rescinded provisions of which they complain most are even more limited.  The

27    50 percent share of royalty revenues that California and New Mexico receive from the federal

28

1   government derives from 30 U.S.C. § 191.  In 2017, ONRR distributed $0 in coal royalties to

2   California, which thus suffered no impact from repeal of the 2016 Rule changes to coal valuation.

3   *See* https://revenuedata.doi.gov/explore/CA/.  ONRR distributed coal royalties of about $5.7

4   million to New Mexico in 2017 (50 percent of the about $11.5 million total royalty from coal

5   production in the state that year).  *See* https://revenuedata.doi.gov/explore/NM/.  That was just 1

6   percent of the total $543,000,000 in coal royalty revenues the agency collected that year

7   nationwide.  *See* https://revenuedata.doi.gov/explore/.  In any event, in the Summary of Royalty

8   Impacts to Industry presented in the preamble to the Repeal Rule, ONRR projected a $0 impact to

9   coal royalty revenues from the regulatory changes in issue. 82 Fed. Reg. at 36,951.  The projected

10  impact to Indian coal leases also is $0.  *Id.*  Therefore, Plaintiffs' claims of impacts from reduced

11  coal royalty revenues, which is the focus of their Complaint, ring completely hollow.

12         For federal gas, in 2017, ONRR collected a total of approximately $4 million in royalties in

13  California, so the state's share was approximately $2 million.  *See*

14  https://revenuedata.doi.gov/explore/CA/ (including gas and natural gas liquids ("NGLs")). Since

15  the overall impact of the valuation rule modifications in issue was approximately 1 percent, the

16  impact to California relating to gas production is just $20,000.  *See* 82 Fed. Reg. at 43,359.

17  California also received only $53 million in oil royalties from onshore federal lands out of nearly

18  $4 billion total royalty revenues from oil production on federal lands.  *See*

19  https://revenuedata.doi.gov/explore/CA/ and https://revenuedata.doi.gov/explore.  Per the ONRR

20  analysis in the Repeal Rule, only a small proportion of the overall $71 million impact to royalty

21  revenues relates to onshore oil valuation issues, across all states.  82 Fed. Reg. at 36,944.  Thus,

22  the potential revenue impact to California's proportion of oil royalties from federal lands again is

23  minimal.

24         Parsing the various elements in the Summary of Royalty Impacts to Industry in the Repeal

25  Rule demonstrates that the potential impacts to the Plaintiffs and other states are even less

26  significant than shown above.  *Id.*  Approximately $28 million, or nearly 40 percent, of the total

27  impact of $71 million relates to the issue of treating subsea bulk movement of deep water OCS

28

production as non-deductible gathering versus deductible transportation.  Because states receive almost no royalties from deep water OCS production, this change has no impacts on states.  Additionally, the revenue impact from eliminating the existing approval of processing allowances in excess of the 66 2/3 percent cap is $14.2 million, an issue that relates to only two gas processing facilities which had received such approvals from ONRR, both of which are in Wyoming (a state that did not join this litigation in support of Plaintiffs).  *See, e.g.*, *Exxon Corp.*, 118 IBLA 221, 1991 WL 218143 (1991).  Setting aside these two issues reduces the projected revenue impacts by 60 percent of the $71 million total projected impact.  It also reduces by nearly 50 percent the total $15.3 million projected impact to all states, of which $7.1 million relates to the extraordinary cost allowance provision impacting only Wyoming.

Of the remaining approximately $28.4 million in total potential revenue impacts, $9.5 million derives from the provisions that artificially capped the amount of transportation or processing allowances a lessee could claim.  As explained above, a bedrock principle of royalty valuation, that ONRR asserted it was maintaining in the 2016 Rule, is the concept that lessees only are required to pay royalty on the value of production at the lease.  This means that lessees must be permitted to deduct their reasonable, actual costs for transportation and processing to avoid artificially inflating royalty value.  ONRR's likelihood of successfully defending those new caps in a legal challenge is very low.  Therefore, realistically assessing the likelihood of ONRR ultimately obtaining those additional revenues further reduces the potential real impact of the Repeal Rule to royalty recipients, and particularly to Plaintiffs.  In short, any financial impacts to Plaintiffs from the Repeal Rule are insignificant.

## CONCLUSION

For the above reasons, as well as reasons explained by Federal Defendants, the Court should grant summary judgment for Defendants, affirm the Repeal Rule, and dismiss the complaint.

1    Dated this 16th day of July, 2018.          Respectfully submitted,

2

3                                                  */s/ Gary J. Smith*
                                                 Gary J. Smith (SBN 141393)
4                                                BEVERIDGE & DIAMOND, P.C.
                                                 456 Montgomery Street, Suite 1800
5                                                San Francisco, CA 94104-1251
                                                 Telephone: (415) 262-4000
6                                                Facsimile: (415) 262-4040
                                                 gsmith@bdlaw.com
7

8                                                Peter J. Schaumberg, *pro hac vice*
                                                 James M. Auslander, *pro hac vice*
9                                                BEVERIDGE & DIAMOND, P.C.
                                                 1350 I St., N.W., Suite 700
10                                               Washington, DC 20005
                                                 Telephone: (202) 789-6009
11                                               Facsimile: (202) 789-6190
                                                 pschaumberg@bdlaw.com
12                                               jauslander@bdlaw.com
                                                 *Attorneys for Proposed Intervenors NMA, WMA, and*
13                                               *API*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ASSOCIATIONS' CROSS-MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT
Case No. 4:17-cv-5948-SBA