UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

STATE OF CALIFORNIA, by and through
XAVIER BECERRA, ATTORNEY
GENERAL; and STATE OF NEW MEXICO,
by and through HECTOR BALDERAS,
ATTORNEY GENERAL,

                Plaintiffs,

   vs.

UNITED STATES DEPARTMENT OF THE
INTERIOR; OFFICE OF NATURAL
RESOURCES REVENUE; DAVID
BERNHARD[1], Acting Secretary of the
Interior; and GREGORY GOULD, Director,
Office of Natural Resources Revenue,

                Defendants.

Case No:  C 17-5948 SBA

**ORDER RE CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

Dkt. 24, 28, 47, 48, 49, 57, 59

Plaintiffs State of California and the State of New Mexico (collectively "Plaintiffs")

bring the instant action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706,

to challenge the Department of Interior's ("DOI") repeal of regulations (collectively

referred to as "the Valuation Rule") that govern the payment of royalties on oil, gas and

coal extracted pursuant to leases of federal and Indian lands.  The Office of Natural

Resources Revenue ("ONRR"), the agency within the DOI responsible for royalty

collections, finalized the Valuation Rule on July 1, 2016, and specified an effective date of

January 1, 2017.  See Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation

Reform; Final Rule, 81 Fed. Reg. 43,338 (July 1, 2016).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes David
Bernhart, Acting Secretary of the Interior, in place of Ryan Zinke ("Zinke"), who resigned
as Secretary of the Interior, effective January 2, 2019.

The repeal process began in April 2017, when the ONRR issued a notice in the Federal Register ("Proposed Repeal") proposing to (1) repeal the Valuation Rule in its entirety and (2) reinstate a set of regulations that had been in effect for decades prior to the promulgation of the Valuation Rule ("pre-Valuation Rule regulations").  See Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform; Proposed Repeal, 82 Fed. Reg. 16,323 (Apr. 4, 2017).  On August 7, 2017, the ONRR issued its final rule repealing the Valuation Rule and reinstating the pre-Valuation Rule regulations ("Final Repeal").  See Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform; Final Repeal, 82 Fed. Reg. 36,934 (Aug. 7, 2017).

Plaintiffs now bring the instant action against the DOI, ONRR and related parties (collectively "Federal Defendants")[2] to challenge the ONRR's issuance of the Final Repeal. The crux of Plaintiffs' APA claims is that the ONRR failed to: (1) provide an adequate, reasoned explanation to justify the Final Repeal; (2) consider alternatives to a complete repeal of the Valuation Rule; and (3) comply with the APA's notice and comment requirement.  The Complaint also alleges a non-APA claim based on various federal statutes.

The parties are presently before the Court on four summary judgment motions filed by Plaintiffs, Federal Defendants, Conservation Intervenors and Industry Intervenors. Having read and considered the papers filed in connection with this matter and being fully informed, summary judgment is GRANTED in favor of Plaintiffs on their APA claims. Plaintiffs' non-APA claim is DISMISSED and Federal Defendants' summary judgment motion as to said claim is DENIED as moot.  The Court, in its discretion, finds this matter

---

[2] The party-defendants are:  the DOI; David Bernhardt, Acting Secretary of the Interior; the ONRR; and Gregory Gould, Director of the ONRR.  There are two sets of intervenors:  (1) Natural Resources Defense Council, Northern Plains Resource Council, The Wilderness Society and Western Organization of Resource Councils (collectively, "Conservation Intervenors"); and (2) National Mining Association, Wyoming Mining Association and American Petroleum Institute (collectively, "Industry Intervenors").  The Conservation Intervenors and Industry Intervenors are aligned with Plaintiffs and Federal Defendants, respectively.

suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.      BACKGROUND

### A.      FACTUAL SUMMARY

#### 1.      Statutory and Regulatory Framework

The federal government leases vast tracts of public and Indian lands to private companies for fossil-fuel exploration, development, and production.  Under the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 181 et seq., the government is entitled to collect royalties based on the "value of the production removed or sold from the lease."  30 U.S.C. § 206(b)(1)(A) (oil and gas); 30 U.S.C.A. § 207(a) (coal); see Fina Oil & Chem. Co. v. Norton, 332 F.3d 672, 673 (D.C. Cir. 2003) (citing statutes).  The DOI is responsible for administering the leases and issuing regulations to carry out and accomplish the purposes of the MLA.  See 30 U.S.C. § 1701; 30 U.S.C. § 189.

In 1982, Congress enacted the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 96 Stat. 2447, as amended, 30 U.S.C. § 1701 et seq., to address the concern that the "system of accounting with respect to royalties and other payments due and owing on oil and gas produced from such lease sites [was] archaic and inadequate."  Id. § 1701(a)(2).  FOGRMA directed the Secretary to establish "a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties, interest, fines, penalties, fees, deposits, and other payments owed, and to collect and account for such amounts in a timely manner."  30 U.S.C. § 1711(a).  The Secretary, in turn, assigned these duties to the Minerals Management Service ("MMS").  47 Fed. Reg. 6138 (1982); Secretarial Order Number 3071, as amended on May 10, 1982; see also 30 C.F.R. § 201.100 (2006).[3]

---

[3] Formed in 1982, the MMS was formerly the Conservation Division of the U.S. Geological Survey.  See Secretarial Order No. 3071, as amended on May 10, 1982.  In 2010, the DOI reorganized the MMS.  Specifically, the ONRR was created to assume MMS's responsibility for collecting payments and royalties and enforcing related regulations. Secretarial Order No. 3200; 75 Fed. Reg. 61,051-01 (Oct. 4, 2010); 76 Fed. Reg. 64,432 (Oct. 18, 2011); 25 C.F.R. §§ 212.6.

In September 1984, the MMS promulgated regulations implementing FOGRMA. 49 Fed. Reg. 37,336, 37,346.  In 1988 and 1989, the MMS amended the regulations governing royalty calculations for oil and gas as well as coal, respectively.  See 30 C.F.R. § 206.100 (1988) (oil); id. § 206.150 (1988) (gas); id. § 206.250 (coal) (1989).  The amended regulations provide that in the case of arm's length sales, the contract price conclusively determines the "value" of the transaction.  30 C.F.R. § 206.152(b)(1) (1988) (gas); 30 C.F.R. § 206.102(b)(1) (1988) (oil); 30 C.F.R. § 206.257(b) (1989) (coal).

In the case of non-arm's length transactions (also referred to as "captive" transactions—i.e., sales involving interested parties or affiliates)—the MMS adopted a sequential "benchmark" system that looks to outside indicia of market value.  See 30 C.F.R. § 206.152(c) (1988) (gas); § 206.102(c) (1988) (oil); and § 206.257(c)(2) (1989) (coal); see generally 76 Fed. Reg. 30,881, 30,882 (2011) (summarizing benchmarks applicable to coal); 76 Fed. Reg. 30,878, 30,879 (2011) (summarizing benchmarks applicable to gas and oil).  Until the enactment of the Valuation Rule, these regulations governed the valuation of gas, oil and coal in calculating royalties under federal and Indian leases.  See Federal and Indian Coal Valuation; Advance Notice of Proposed Rulemaking, 76 Fed. Reg. 30,881, 30,882 (May 27, 2011); Federal Oil and Gas Valuation; Advance Notice of Proposed Rulemaking, 76 Fed. Reg. 30,878, 30,879 (May 27, 2011).

### 2.    Promulgation of the Valuation Rule

In December 2007 the Subcommittee on Royalty Management ("Subcommittee"), a subcommittee of the DOI's Royalty Policy Committee, issued a report titled ''Mineral Revenue Collection from Federal and Indian Lands and the Outer Continental Shelf.''  80 Fed. Reg. 608 (Jan. 6, 2015).  The report identified pervasive problems with ONRR's valuation regulations that undermined the agency's ability to accurately calculate royalties. Id.  As to the existing benchmark method for valuing non-arm's length transactions, the report noted that the regulations had proven "difficult for industry to follow and ONRR to administer."  80 Fed. Reg. 608, 617, 628.  The Subcommittee proposed various

amendments to the ONRR's valuation regulations, including eliminating benchmarks, to permit the DOI to better discharge its royalty valuation responsibilities.  Id. at 608.

The Subcommittee's report prompted the ONRR to commence an extended process to update and modernize its royalty regulations.  In 2011, ONRR published two advanced notices of proposed rulemaking, seeking suggestions for new valuation methodologies.  See 76 Fed. Reg. 30,878 (May 27, 2011) (oil and gas); 76 Fed. Reg. 30,881 (May 27, 2011) (coal).  The agency noted that existing rules governing federal gas and coal had been in effect since 1988 and 1989, respectively, and that the regulations "have not kept pace with significant changes that have occurred in the domestic … market during the last 20-plus years."  76 Fed. Reg. 30,878, 30,881.[4]  These notices were followed by six public workshops in September and October 2011, and a five-year rulemaking process to update the regulations pertaining to oil, gas and coal royalties.  AR 21.

On January 6, 2015, the ONRR issued the "Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform; Proposed Rule" ("Proposed Valuation Rule"), a consolidated proposal to reform its coal, oil, and gas valuation regulations.  80 Fed. Reg. 608 (Jan. 6, 2015).  The ONRR accepted public comment on the Proposed Valuation Rule over a 120-day period, during which the agency received more than 1,000 pages of written comments from over 300 commenters and 190,000 petition signatories, including "industry, industry trade groups, Congress, State governors, States, local municipalities, two Tribes, local businesses, public interest groups, and individual commenters." 81 Fed. Reg. 43,338, 43,338; AR 21. The agency "carefully considered all of the public comments … and, in some instances, revised the language of the final rule based on these comments."  Id. "Coupled with [ONRR's] early stakeholder engagement, [this] extended comment period allowed for a careful review of the many complexities contained in the proposed rule."  Id.

---

[4] The federal oil valuation regulations were amended in 2000.  See 80 Fed. Reg. 608.

On July 1, 2016, ONRR finalized the Valuation Rule, with a stated effective date of January 1, 2017.  81 Fed. Reg. 43,338, 43,338.  ONRR described the purpose of the Rule as follows:

> (1) to offer greater simplicity, certainty, clarity, and consistency in product valuation for mineral lessees and mineral revenue recipients; (2) to ensure that Indian mineral lessors receive the maximum revenues from coal resources on their land, consistent with the Secretary's trust responsibility and lease terms; (3) to decrease industry's cost of compliance and ONRR's cost to ensure industry compliance; and (4) to provide early certainty to industry and to ONRR that companies have paid every dollar due.

Id.  The ONRR estimated that the Rule would increase royalty collections by between $71.9 million and $84.9 million.  Id. at 43,359. Importantly, the Valuation Rule responded to concerns that companies were significantly undervaluing coal sold in non-arm's length transactions. Whereas lessees previously used the benchmark system to calculate royalties in such contexts, the Valuation Rule instead required that coal be valued using the first arm's length sale between independent, nonaffiliated parties with opposing economic interests, and added a definition of the term "coal cooperative" to clarify what constitutes an arm's length relationship.  81 Fed, Reg. 43,338, 43,339, 43,354-55. The Rule also added a "default provision" to address situations where the Secretary of Interior is unable to reasonably determine the correct value of resource production.  Id. at 43,341, 43,351, 43,356.

### 3.      Repeal of the Valuation Rule

The Valuation Rule was set to effect on January 1, 2017, but lessees were not required to report and pay royalties under the Rule until February 28, 2017.  See Postponement of Effectiveness of the Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform 2017 Valuation Rule ("Postponement Notice"), 82 Fed. Reg. 11,823 (Feb. 27, 2017).  Prior to the specified effective date of the Valuation Rule, the ONRR held a series of eleven training sessions from October 17, 2016 to December 15, 2016, to assist the industry's transition to the new valuation system.  82 Fed. Reg. 36,934, 36,935; AR 1305.  Shortly after the conclusion of the training sessions, several industry

groups challenged the Valuation Rule by filing lawsuits in the U.S. District Court for the District of Wyoming on December 29, 2016. AR 3469-78, 3479-87, 3665-72.  The groups alleged that the Valuation Rule would create widespread uncertainty and render compliance impossible. AR 3472-76, 3480, 3482-86, 3668-69.

On February 17, 2017, the petitioners in the District of Wyoming cases requested the ONRR to postpone implementation of the Valuation Rule.  The ONRR responded that the Wyoming lawsuits raised "serious questions concerning the validity or prudence of certain provisions of the 2017 Valuation Rule, such as the expansion of the 'default provision' and the use of the sales price of electricity to value coal."  82 Fed. Reg. 11,823, 11,823.  Those concerns were identical to those "voiced by many industry representatives in workshops during the public comment period that preceded the 2017 Valuation Rule's promulgation." Id.  Thus, on February 27, 2017, the ONRR published the Postponement Notice in the Federal Register, stating that "justice requires it to postpone the effectiveness of the 2017 Valuation Rule…."  Id.

In response to the Postponement Notice, California and New Mexico, the same Plaintiffs herein, filed suit in this Court alleging that the ONRR's action violated the APA. See Case No. 17-cv-2376-EDL (N.D. Cal.).  Magistrate Judge Elizabeth Laporte agreed and declared that the ONRR's postponement of the Valuation Rule violated the APA. Becerra v. U.S. Dept. of the Interior, 276 F. Supp. 3d 953, 967 (N.D. Cal. 2017).[5] However, she declined to vacate the Postponement Notice in light of the ONRR's plan to repeal the Valuation Rule.  Id.

On April 4, 2017, the ONRR posted the three-page Proposed Repeal in the Federal Register, "proposing to repeal the 2017 Valuation Rule in its entirety" and to restore the pre-Valuation Rule regulations.  Id.  The ONRR claimed that the repeal "would be consistent with" Executive Order 13783, issued on March 28, 2017.  Id.  The stated rationale for the repeal was to:

---

[5] Magistrate Judge Laporte, the assigned judge in Becerra, declined to relate the instant action.

> (a) preserve the regulatory status quo while ONRR reconsiders whether revisions are appropriate or needed to the pre-existing regulations governing royalty values; (b) avoid the costs to both government and industry of converting to controversial new royalty reporting and payment systems while the reconsideration takes place; (c) eliminate the need for continued and uncertain litigation over the validity of the 2017 Valuation Rule, and (d) enhance the lessees' ability to timely and accurately report and pay royalties, because they would continue to use a well-known system that has been in place for decades.

Id.  The notice did not identify any particular defects in the Valuation Rule; rather, the ONRR asserted that, since the Valuation Rule's promulgation, "it has … identified several areas in the rule that warrant reconsideration to meet policy and implementation objectives, including but not limited to, how to value coal production in certain non-arm's length transactions, how to value coal when the first arm's-length sale of the coal is electricity, how to value gas in certain no-sale situations, and under what circumstances, and on whom, ONRR's valuation determinations are binding."  Id.

Simultaneously, but independent of the Proposed Repeal, the ONRR published a notice in the Federal Register seeking "comments and suggestions from affected parties and the interested public on whether revisions to the regulations governing the valuation, for royalty purposes, of oil and gas produced from Federal onshore and offshore leases and coal produced from Federal and Indian leases, are needed and, if so, what specific revisions should be considered."  Federal Oil and Gas and Federal and Indian Coal Valuation, Advance Notice of Proposed Rulemaking ("ANPRM"), 82 Fed. Reg. 16,325 (Apr. 4, 2017).  The ANPRM later clarifies the comments solicited as follows:

> As discussed above, ONRR requests comments on two possible scenarios pending the outcome of the proposed rule to repeal the 2017 Valuation Rule. We recognize the outcome of the proposed rule to repeal the 2017 Valuation Rule may not be known by the closing date of this ANPRM. Therefore, we encourage commenters to consider both of the two possible outcomes of that rulemaking when preparing their submissions as follows.
>
> 1. If the 2017 Valuation Rule is repealed, ONRR requests comments regarding whether a new rulemaking would be beneficial or is necessary. If commenters believe that a new rulemaking would be beneficial, ONRR requests comments

> regarding specific changes to the Federal oil and gas and Federal and Indian coal valuation regulations.
>
> 2. If the 2017 Valuation Rule is not repealed, ONRR requests comments regarding whether potential changes to the 2017 Valuation Rule are needed. Possible topics include, but are not limited to:
>
> • Whether ONRR should have one rule addressing Federal oil and gas and Federal and Indian coal valuation, or separate rulemakings.
>
> • How best to value non-arm's-length coal sales and/or sales between affiliates.
>
> • Whether ONRR should update the valuation regulations governing nonarm's-length dispositions of Federal gas, and if so, how.
>
> • Whether ONRR should address marketable condition and/or unbundling, and if so, how.
>
> • Whether ONRR should have a default provision clarifying how ONRR will exercise Secretarial authority to determine value for royalty purposes in cases where there is misconduct, breach of duty to market, or ONRR cannot otherwise verify value. Other potential valuation methods or necessary changes to ONRR valuation regulations.

Id. at 16,326.

The ONRR provided for a thirty-day comment period in connection with both the Proposed Repeal and the ANPRM. Although the Proposed Repeal instructs on how to submit comments, it does not specify any areas or topics on which the ONRR would like to receive comments. The ONRR received numerous requests for extensions of the comment period, which it denied. Id.; AR 6076, 6380, 6492, 8351-52. The agency received 776 comments in favor of and 1,567 comments opposed to the Proposed Repeal. AR 8957. The majority of those comments focused on the Valuation Rule's provisions pertaining to coal. 82 Fed. Reg. 36,934, 36,939. In response to the ANPRM, ONRR received thirty-three comments, see AR 8961-62, 8973-81.

On August 7, 2017, ONRR published the Final Repeal, which repealed the Valuation Rule "in its entirety" and reinstated the pre-Valuation Rule regulations. 82 Fed. Reg. 36,934. ONRR presented three principal reasons for the Repeal: (1) the Valuation Rule "has a number of defects that make certain provisions challenging to apply"; (2) the

Valuation Rule conflicts with Executive Order 13783—Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16,093, because "certain provisions of the … Valuation Rule would unnecessarily burden the development of Federal oil and gas and Federal and Indian coal beyond the degree necessary to protect the public interest or otherwise comply with the law"; and (3) a Royalty Policy Committee will be reestablished to lead the "development and promulgation of a new, revised valuation rule…."  82 Fed. Reg. 36,934, 36,934.

### B.   PROCEDURAL HISTORY

On October 7, 2017, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief in this Court against Federal Defendants.  The Complaint alleges three claims: (1) Violation of the APA, 5 U.S.C. § 706; (2) Violation of FOGRMA, 43 U.S.C. § 1701, et seq.; the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§1701-1736, 1737-1782; MLA, 30 U.S.C. § 181; and the APA; and (3) Violation of the APA, 5 U.S.C. §§ 553(b), 706.  As relief, Plaintiffs seek:  a judicial declaration that Federal Defendants acted arbitrarily, capriciously and contrary to law in promulgating the Final Repeal; vacatur of the Final Repeal; and an award of attorney's fees and costs.

Plaintiffs have filed a motion for summary judgment, focusing on their claims under the APA.  Federal Defendants have filed a combined opposition to Plaintiffs' motion and a cross-motion for summary judgment as to all claims alleged in the Complaint. Conservation Intervenors and Industry Intervenors have filed unopposed motions to intervene and motions for summary judgment.[6]  The Institute for Policy Integrity at the New York University School of Law ("Institute") has filed a motion for leave to file an amicus curiae brief in support of Plaintiffs' summary judgment motion, attached to which is a copy of the proposed brief.  Only Federal Defendants oppose the Institute's motion.

---

[6] Pursuant to Federal Rule of Civil Procedure 24, the Court grants the Conservation Intervenors and Industry Intervenors' unopposed motions to intervene.

**C.   MOTION FOR LEAVE TO FILE AMICUS BRIEF**

The "classic role" of amicus curiae is to assist a court in a case of public interest by "supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." Miller-Wohl Co. v. Comm'r of Labor & Indus. State of Mont., 694 F.2d 203, 204 (9th Cir. 1982). As this Court has previously recognized, "[w]hether to allow Amici to file a brief is solely within the Court's discretion, and generally courts have 'exercised great liberality'" in permitting amicus briefs. Woodfin Suite Hotels, LLC v. City of Emeryville, No. C 06-1254 SBA, 2007 WL 81911, at *3 (N.D. Cal. Jan. 9, 2007) (citations omitted, alterations in orig.).[7] There are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful or otherwise desirable to the court. Id.; see Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir. 1982) ("The district court has "broad discretion" to permit amicus briefs."). The scope of amicus briefs, however, should be limited to the issues raised by the parties. See Citizens Against Casino Gambling in Erie Cty. v. Kempthorne, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007) ("Amicus participation goes beyond its proper role if the submission is used to present wholly new issues not raised by the parties.").

Federal Defendants object to the Institute's amicus brief, claiming that it contains extra-record citations, raises new issues, and adds nothing new to the proceedings. None of these objections is compelling. First, the extra-record citations, which are provided to support contextual points, are neither material to the Institute's arguments nor the Court's ruling. Second, the Institute's brief does not, as Federal Defendants assert, present a new claim that the ONRR violated Executive Order 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993). Rather, the Institute cites that Order to underscore the scope of the ONRR's obligation to

---

[7] Federal Defendants asserts that Woodfin is "wholly inapplicable" because it was not brought under the APA. Fed. Defs.' Opp'n to Mot. for Leave to File an Amicus Brief at 5, Dkt. 56. That contention is wholly without merit. Woodfin simply recites the general standard for permitting an amicus brief. Notably, Federal Defendants cite no authority for the notion that there is a different standard for permitting amicus briefs in APA cases.

1   conduct a cost-benefit analysis in connection with "significant regulatory action."  Finally,

2   it is inapposite that an amicus brief raises the same issues as the parties' briefs.  The salient

3   question is whether such brief is helpful to the Court.  In this case, the Institute's brief is

4   useful in that it amplifies a number of points raised in parties' papers.

5           Accordingly, the Institute's motion to file an amicus brief is granted.

6   **II.   <u>LEGAL STANDARD</u>**

7           Summary judgment should be granted only if the moving party has shown that there

8   are no genuine issues of material fact and that the moving party is entitled to judgment as a

9   matter of law. Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  In a

10  case involving review of a final agency action under the APA, however, the "genuine

11  dispute of material fact" standard for summary judgment normally is inapplicable.  <u>See</u> <u>San</u>

12  <u>Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv.</u>, 819 F. Supp. 2d 1077, 1083-84

13  (E.D. Cal. 2011).  Because a court is reviewing an administrative decision based on an

14  administrative record, there typically are no "disputed facts that the district court must

15  resolve."  <u>Occidental Eng'g Co. v. I.N.S.</u>, 753 F.2d 766, 769 (9th Cir. 1985).   Rather,

16  "summary judgment is an appropriate mechanism for deciding the legal question of

17  whether the agency could reasonably have found the facts as it did."  <u>Id.</u>

18  **III.   <u>DISCUSSION</u>**

19          Plaintiffs and Conservation Intervenors contend that the ONRR violated the APA in

20  issuing the Final Repeal, which repealed the Valuation Rule and restored the prior

21  regulatory scheme.  First, they contend that the ONRR failed to provide a reasoned

22  explanation for repealing the Valuation Rule.  Second, they argue that the ONRR failed to

23  comply with the APA's notice and comment requirement.  Federal Defendants and Industry

24  Intervenors disagree and argue that the Final Repeal should be upheld.

25          **A.   <span style="font-variant:small-caps">Reasoned Explanation</span>**

26          Judicial review of an agency's rule making process is governed by the APA,

27  5 U.S.C. § 706(2).  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.</u>

28  <u>Co.</u> ("<u>State Farm</u>"), 463 U.S. 29, 41 (1983).  The APA provides that a reviewing court may

1  "hold unlawful and set aside agency action, findings, and conclusions found to be ...

2  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

3  5 U.S.C. § 706(2).  Final agency action, which is at issue here, is reviewed under the

4  "arbitrary and capricious" standard.  Mt. St. Helens Mining & Recovery Ltd. P'ship v.

5  United States, 384 F.3d 721, 727 (9th Cir. 2004).  "An agency action is arbitrary and

6  capricious if the agency has relied on factors which Congress has not intended it to

7  consider, entirely failed to consider an important aspect of the problem, offered an

8  explanation for its decision that runs counter to the evidence before the agency, or is so

9  implausible that it could not be ascribed to a difference in view or the product of agency

10 expertise."  Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101,

11 1109 (9th Cir. 2012) (internal quotation omitted).  "The scope of review under the

12 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for

13 that of the agency."  State Farm, 463 U.S. at 43.

14      "Agencies are free to change their existing policies as long as they provide a

15 reasoned explanation for the change."  Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117,

16 2125 (2016).  In FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009), the Supreme

17 Court addressed the applicable APA requirements when an agency seeks to change its

18 policies:

19          In Fox, the Court held that a policy change complies with the
           APA if the agency (1) displays "awareness that it is changing
20         position," (2) shows that "the new policy is permissible under
           the statute," (3) "believes" the new policy is better, and
21         (4) provides "good reasons" for the new policy, which, if the
           "new policy rests upon factual findings that contradict those
22         which underlay its prior policy," must include "a reasoned
           explanation ... for disregarding facts and circumstances that
23         underlay or were engendered by the prior policy."

24 Organized Vill. of Kake v. U.S. Dep't of Agric. ("Kake"), 795 F.3d 956, 966 (9th Cir.

25 2015) (quoting in part Fox, 556 U.S. at 515-16).  With regard to the fourth "good reasons"

26 requirement, Fox makes clear that when an agency seeks to disregard facts underlying the

27 original rule, it must provide "a more detailed justification than what would suffice for new

28 policy created on a blank slate."  556 U.S. at 515.  In other words, "a reasoned explanation

is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." Navarro, 136 S. Ct. at 2126 (quoting Fox, 556 U.S. at 515-16). "It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" Id. (quoting National Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)).

Federal Defendants maintain that the ONRR had "good reasons" for repealing the Valuation Rule and reinstating the prior regulations it had just replaced.[8] In the Final Repeal, the ONRR justified the repeal by claiming that: (1) the Valuation Rule contained a number of "defects" that posed "administrative challenges"; (2) the Valuation Rule violated Executive Order 13783; and (3) a Royalty Policy Committee would be reestablished to advise the ONRR on setting market valuations for royalty collection purposes with respect to energy and natural resources and to consider new valuation rules. 82 Fed. Reg. 36,934, 36,934. As will be discussed below, the recited justifications fail to pass muster under the Supreme Court authority cited above.

### 1. Defects

#### a) Failure to Explain Inconsistencies

The Final Repeal identified seven "defects" that allegedly "make certain provisions [of the Valuation Rule] challenging to comply with, implement or enforce." 82 Fed. Reg. 36,934, 36,934. But as the Conservation Intervenors point out—and Federal Defendants do not dispute—the purported defects cited by the ONRR in the Final Repeal were not new. Rather, they reflected industry concerns previously considered and rejected by the ONRR

---

[8] Federal Defendants claim they need only articulate "good reasons" for the Final Repeal and that the ONRR amply supplied its reasons for believing that certain aspects of the Valuation Rule would be unworkable in practice. See Fed. Defs.' Mot. at 13-14; Fed. Defs.' Reply at 1-2, Dkt. 62. To that end, both Federal Defendants and Industry Intervenors focus much of their discussion on purported defects in the Valuation Rule. See Fed. Defs.' Mot. at 6-14; Fed. Defs.' Reply at 3-10; Indus. Mot. at 11-21; Indus. Reply at 3-11, Dkt. 63. As discussed, however, the Supreme Court requires a detailed or reasoned explanation when the current findings in support of a policy change contradict earlier findings, as is the case here. Fox, 556 U.S. at 515-16. Neither Federal Defendants nor Industry Intervenors acknowledge this requirement, much less address it in the context of the Final Repeal.

during the five-year rulemaking process leading to the ONRR's adoption of the Valuation Rule.[9]  Given that the ONRR was not writing on a "blank slate" in connection with its adoption of the Final Repeal, it was incumbent upon it to provide a reasoned explanation as to why the industry concerns it previously rejected—as well as its prior findings in support of adopting the Valuation Rule—now justified returning to the pre-Valuation Rule regulatory framework.  See Fox, 556 U.S. at 515.  Nowhere in the Final Repeal does the ONRR provide such an explanation.

The ONRR's flawed analysis is particularly illustrated in its discussion of the Valuation Rule's method of valuing non-arm's length transactions involving coal.  Previously, the value of such transactions was determined by the application of various "'benchmarks' that look to outside indicia of market value."  76 Fed. Reg. 30,881, 30,882.[10]  As noted, a 2007 report by the Royalty Policy Committee was critical of that method of valuation and recommended eliminating use of the benchmarks.  Those criticisms motivated the ONRR to study the matter further.  Thus, in 2011, the ONRR issued two advanced notices of proposed rulemaking, providing notice of intention to change the rules governing the valuation of coal, oil and gas produced from Federal and

---

[9] Industry Intervenors confirm that they previously provided "voluminous comments" containing "detailed legal arguments and economic analyses" on the proposed rule that eventually became the Valuation Rule.  Indus. Mot. at 5.  They add that with its issuance of the Final Repeal, the ONRR was "finally willing to acknowledge" the defects in the Valuation Rule about which Industry Intervenors had "previously warned" in its comments to the ONRR.  Id. at 1, 5, 6.  Thus, it is abundantly clear that the defects cited by the ONRR in the Final Repeal are the same issues that the ONRR had rejected in enacting the Valuation Rule.  E.g., Becerra, 276 F. Supp. 3d at 965 (finding that "many, if not all, of the same objections ... were advanced during the five-year long rulemaking process").

[10] The benchmarks operate in a sequential fashion such that if the criteria specified in the first benchmark is inapplicable, the lessee then applies the next benchmark, and so on.  Id. (citing 30 C.F.R. § 1206.257(c)(2)(i)-(v)).  The benchmark system has been viewed by some as advantageous to the energy industry.  See Bethany A. Davis Noll, Denise A. Grab, Deregulation: Process and Procedures That Govern Agency Decisionmaking in an Era of Rollbacks, 38 Energy L.J. 269, 280-81 (2017) ("Prior to the [Valuation Rule], companies had been taking advantage of an antiquated 'benchmark' system to pay royalties only on lower domestic sales prices obtained through captive transactions rather than on the real (market) price obtained through the ultimate arm's length sale.").

Indian leases.  See 76 Fed. Reg. 30,881 (May 27, 2011) (coal); 76 Fed. Reg. 30,878 (May 27, 2011) (oil and gas).

The ONRR's notices identified numerous flaws in the existing coal valuation regulations and solicited comments on eliminating the use of benchmarks.  76 Fed. Reg. 30,881, 30,883 see also 80 Fed. Reg. 608, 628 ("The benchmarks applicable to coal in non-arm's length and no-sale situations have proven difficult to use in practice.").  In place of the benchmarks, the ONRR proposed to value non-arm's length coal transactions based on gross proceeds from the first arm's length-sale of coal.  80 Fed. Reg. 608, 609.  In cases where no arm's length-sale of coal was available for comparison—and where the lessees or their affiliates use the coal to generate electricity and sell electricity—"the ONRR propose[d] to value the coal for royalty purposes based on the gross proceeds the lessee or its affiliate receive for the power plant's arm's length sales of electricity, less applicable deductions."  Id.

In promulgating the Valuation Rule, the ONRR specifically "sought input on the merits of eliminating the benchmarks for valuation of non-arm's length sales…."  81 Fed. Reg. 43,338, 43,339.  The ONRR received numerous comments on its proposal to eliminate the benchmarks and to instead value coal based on the first arm's-length sale.  Id. at 43,354.  Industry commenters urged the ONRR to retain the benchmark system to value coal sold under non-arm's length contracts.  Id.  Some commenters opined that valuing coal at the first arm's-length sale was "unnecessarily complex," while others observed that such an approach would not accurately reflect the value of the coal sold.  Id.  The ONRR also considered comments that the benchmark system, or a modified version thereof, should be retained.  Id.  The ONRR rejected these concerns, finding "ample evidence" to support the conclusion that "[t]he values established in arm's length transactions are the best indication of market value."  Id.  In addition, it strongly criticized the benchmark system as "difficult to use in practice," "challenging" and "at times, impossible for lessees."  Id.  In sum, the ONRR concluded that the new Valuation Rule was superior to the benchmark system.  Id.

In repealing the Valuation Rule, the ONRR completely contradicts its prior findings. Despite its previous, detailed conclusions in support of the Valuation Rule's approach to valuing non-arm's length coal transactions—and dismissing the industry's criticisms thereof—the ONRR now finds the approach prescribed in the Valuation Rule to be "unnecessarily complicated and burdensome to implement and enforce."  82 Fed. Reg. 36,934, 36,935.[11]  Likewise, in contrast to its prior criticisms of the benchmarks, the ONRR now lauds the benchmark system as "proven and time-tested," id. at 36,941, as well as "reasonable, reliable, and consistent," id. at 36,940.  Although the ONRR is entitled to change its position, it must provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy."  Navarro, 136 S. Ct. at 2126.  Neither Federal Defendants nor Industry Intervenors identify where in the Final Repeal or elsewhere in the record the ONRR provided such an explanation.[12]

The Court finds that the ONRR's conclusory explanation in the Final Repeal fails to satisfy its obligation to explain the inconsistencies between its prior findings in enacting the Valuation Rule and its decision to repeal such Rule.  The ONRR's repeal of the Valuation Rule is therefore arbitrary and capricious.  See Navarro, 136 S. Ct. at 2126 (holding that an agency's change in practice without explaining a prior inconsistent finding is arbitrary and

---

[11] In their brief, Federal Defendants assert that the Valuation Rule's method for valuing non-arm's length coal transactions "*proved to be* 'very challenging,' 82 Fed. Reg. 36,936 … if not 'functionally impossible, id. at 36,941.'"  Fed. Defs.' Reply at 4 (emphasis added).  This contention is unfounded.  Since the royalty provisions of the Valuation Rule were, for all intents and purposes, never implemented, it is inaccurate for Defendants to claim that valuing non-arm's length coal sales "proved to be" difficult.  Moreover, the ONRR misstates the record.  In the Final Repeal, the ONRR merely speculated that "it *would be* very challenging for lessees to calculate and pay royalties" if the Valuation Rule took effect.  82 Fed. Reg. 36,934, 36,936 (emphasis added).  As for the "functionally impossible" remark, it was made by "industry commentators" (who prefer the benchmark system) and was not a finding by the ONRR.  Id. at 36,941.

[12] Like the purported defect pertaining to valuing non-arm's length coal transactions, the other "defects" in the Valuation Rule identified by the Final Repeal also lack the necessary reasoned explanation.  See Navarro, 136 S. Ct. at 2126.  For instance, in justifying the new "default" valuation rule in the Valuation Rule, the ONRR explained that it had encountered "a wide range of situations in which lessees have inaccurately calculated value."  80 Fed. Reg. 608, 621.  However, the ONRR did not reconcile that previous finding in the Final Repeal.

1  capricious); accord Kake, 795 F.3d at 969 ("The 2003 [Rule] does not explain why an

2  action that it found posed a prohibitive risk to the Tongass environment only two years

3  before now poses merely a 'minor' one. The absence of a reasoned explanation for

4  disregarding previous factual findings violates the APA.").

5  ### b)     *Failure to Discuss Alternatives*

6  Even if the ONRR's discussion of the alleged defects in the Valuation Rule were not

7  deficient, the Court is unpersuaded that the ONRR adequately considered alternatives to a

8  complete repeal.  When considering revoking a rule, an agency must consider alternatives

9  in lieu of a complete repeal, such as by addressing the deficiencies individually.  Yakima

10  Valley Cablevision, Inc. v. F.C.C., 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of

11  an agency to consider obvious alternatives has led uniformly to reversal.") (citing cases);

12  Farmers Union Cent. Exch., Inc. v. F.E.R.C., 734 F.2d 1486, 1511 (D.C. Cir. 1984) ("It is

13  well established that an agency has a duty to consider responsible alternatives to its chosen

14  policy and to give a reasoned explanation for its rejection of such alternatives."); e.g., Pub.

15  Citizen v. Steed, 733 F.2d 93, 103 (D.C. Cir. 1984) (holding that the National Highway

16  Traffic Safety Administration's suspension of tire-grading regulation was arbitrary and

17  capricious because agency failed to pursue available alternatives).

18  In response to the Proposed Repeal, the ONRR received comments suggesting that

19  in lieu of complete repeal of the Valuation Rule, the ONRR should address specific

20  problems "separately and not entirely abandon the rule in its entirety."  82 Fed. Reg.

21  36,934, 36,940.[13]  The ONRR responded that "[t]he cost of implementing the rule and

22  subsequently trying to fix the defects in one or more separate rulemakings would far exceed

23  the cost of repealing and replacing the rule."  Id.  That conclusory statement—unsupported

24  by facts, reasoning or analysis—is legally insufficient.  See Amerijet Int'l, Inc. v. Pistole,

25  753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's

26

27  _____

      [13] These comments came from an unidentified member of Congress and a public
28  interest group, who opined that, in light of the significant resources expended in developing
    the Valuation Rule, a complete repeal would be wasteful.  82 Fed. Reg. 36,934, 36,940.

statement must be one *of reasoning*.") (internal quotation marks omitted); see also

NetCoalition v. S.E.C., 615 F.3d 525, 539 (D.C. Cir. 2013) (holding that the court would

not "defer to the agency's conclusory or unsupported suppositions") (internal quotation

marks omitted)).[14] The Court finds that the ONRR's failure to adequately consider

alternatives to repealing the Valuation Rule in its entirety to be arbitrary and capricious.

See State of California v. Bureau of Land Mgmt. ("California I"), 286 F. Supp. 3d 1054,

1066-67 (N.D. Cal. 2018) (finding that even if the agency had provided factual evidence to

support its claim that the new waste reduction regulations at issue burdened small

operators, a "blanket suspension" of the regulations was arbitrary and capricious because

the suspension was "not properly tailored" to address the allegedly errant provision).

### 2. Executive Order 13783

The second justification recited in the Final Repeal for repealing the Valuation Rule

is Executive Order 13783, issued on March 28, 2017.  The Executive Order, entitled

"Promoting Energy Independence and Economic Growth," states, in pertinent part, as

follows:

> [I]t is the policy of the United States that executive departments and agencies (agencies) immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that *unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law.*

Exec. Order 13783 (Mar. 28, 2017) (emphasis added).  Citing unspecified comments and its

own "internal review," the ONRR concluded in the Final Repeal that "certain provisions of

the [] Valuation Rule would unnecessarily burden the development of Federal oil and gas

---

[14] It bears noting that, based on the comments received, the most controversial aspect of the Valuation Rule was its new provisions for valuing coal transactions.  82 Fed. Reg. 36,934, 36,939.  That begs the question why the ONRR did not consider addressing those particular concerns, as opposed to summarily stating that it would be more cost effective to completely repeal the Valuation Rule.

and Federal and Indian coal beyond the degree necessary to protect the public interest or otherwise comply with the law."  82 Fed. Reg. 36,934, 36,934.

To support its findings regarding the Valuation Rule's alleged "burden" on the development of domestic energy sources under Executive Order 13783, the ONRR simply repeated its assertion made in discussing the alleged defects of the Valuation Rule that the new provisions governing electricity sales and coal cooperatives were "too broad and ambiguous to comply with or enforce."  82 Fed. Reg. 36,934, 36,938-39.  The ONRR further asserted that "a number of provisions" in the Rule "would unduly burden or unnecessarily obstruct, delay, curtail, or otherwise impose significant costs on the production, utilization, or delivery of Federal oil or gas or Federal or Indian coal."  Id. at 36,938.  These conclusory assertions are inadequate, given that the ONRR failed to provide any data or analysis to support them.  See Amerijet Int'l, 753 F.3d at 1350 (conclusory agency statements deemed insufficient); e.g., California I, 286 F. Supp. 3d at 1067 (finding that the agency failed to provide an adequate explanation because it failed to "point to any fact that justifies its assertion that the Waste Prevention Rule encumbers energy production").

More fundamentally, the ONRR's speculation that provisions of the Valuation Rule would be unduly burdensome, difficult to apply and increase costs, directly contradict its previous findings in its promulgation of the Valuation Rule.  At that time, the ONRR specifically found that, on a net impact basis, the new regulations would increase royalty collections by between $71.9 million and $84.9 million and reduce administrative costs by $3.61 million.  81 Fed. Reg. 43,338, 43,359.  In addition, the ONRR expressly found that the Valuation Rule would *not*: (1) "cause a major increase in costs or prices for … individual industries"; (2) "have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises"; (3) "alter, in any material way, natural resources exploration, production, or transportation"; or (4) constitute a significant regulatory action, i.e., one likely to have a significant adverse effect on the supply,

distribution, or use of energy.   81 Fed. Reg. 43,338, 43,368.  Yet, in the Final Repeal, the ONRR contradicts those findings by asserting that the Valuation Rule would "unduly burden" energy production, and that the coal provisions, in particular, would produce "significant costs."  82 Fed. Reg. 36,934, 36,938.  The ONRR's repeal of the Valuation Rule without a reasoned explanation reconciling these inconsistencies is arbitrary and capricious.  See Navarro, 136 S. Ct. at 2126; accord Kake, 795 F.3d at 969.

Federal Defendants contend that the ONRR, in fact, considered the "pros and cons of repeal" and string-cites a number of documents in the record.  Defs.' Mot. at 21.  These documents consist of internal agency documents that summarize the public comments ONRR received on the proposed repeal.  As such, the documents—which do not contain any agency response to the comments—hardly constitute a reasoned explanation by the ONRR for supporting its decision to forfeit the Valuation Rule's royalty benefits and administrative cost savings.  See State Farm, 463 U.S. at 43 (an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted); see also California v. Bureau of Land Mgmt. (California II"), 277 F. Supp. 3d 1106, 1123 (N.D. Cal. 2017) (finding that the agency's failure to provide a reasoned explanation for its decision to suspend a rule based on the rule's costs, while ignoring its benefits, violated the APA).[15]

### 3.    Royalty Policy Committee

The ONRR's third and final rationale for the Final Repeal is that the recently reestablished Royalty Policy Committee would "advise ONRR on current and emerging" valuation issues.  82 Fed. Reg. 36,934, 36,934.  According to the ONRR, it "expects that" these consultations will, in turn, "lead to the development and promulgation of a new,

---

[15] The Industry Intervenors contend that fiscal impact on federal, state, and local governments and to the public from the Final Repeal (i.e., $60.1 to 74.8 million) amounts to 1 percent or less of the total amount of total royalties collected from oil, gas and coal production leases on federal and Indian lands.  Industry Mot. at 21.  The Court disagrees with the suggestion, inherent in Industry Intervenors' argument, an agency may disregard ostensibly nominal benefits of a rule.  See California II, 277 F. Supp. 3d at 1122 ("Without considering both the costs and the benefits of" a deregulatory action, an agency "fail[s] to take [an] 'important aspect' of the problem into account.").

revised valuation rule that will address the various problems that have now been identified in the rule we are repealing." Id.  In essence, the ONRR anticipates that the Committee may at some point supply reasons for repealing the Valuation Rule.  But predicted future actions cannot be used to support a decision already made.  See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) (noting that an agency's justification for its action must be presented in the order taking such action); N. Air Cargo v. U.S. Postal Serv., 674 F.3d 852, 860 (D.C. Cir. 2012) (explaining that "agency action ... can be upheld only on the basis of a contemporaneous justification by the agency itself").  Predicating a repeal decision on recommendations that may or may not occur in the future is arbitrary and capricious.  See State Farm, 463 U.S. at 43 (stating that an agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action").

Federal Defendants argue that the "ONRR did not rely on a future Committee analysis to justify the repeal rulemaking." Fed. Defs.' Mot. at 20.[16]  Rather, they argue that the "ONRR relied on the Valuation Rule's defects" to justify the repeal, "while noting that, in the future, ONRR, through the Committee, would try to improve the valuation regulations." Id.; see also Indus. Mot. at 3, Dkt. 59 (suggesting that the Committee's process is "forward-looking" and "separate" from the repeal).  To the extent that the ONRR relied solely on the alleged defects as a basis for the repeal, the repeal is improper.  As already discussed, the ONRR's analysis of those defects fails to comport with the APA, inter alia, because the ONRR failed to adequately explain its decision to repeal the Valuation Rule.  In any event, Federal Defendants' contention is belied by the Final Repeal itself.  There, the ONRR states that "we have decided to repeal the 2017 Valuation Rule in its entirety, principally for the three following reasons," with the third reason being the reestablishment of the Committee which "will lead to the development and promulgation of

---

[16] This argument is at odds with statements presented earlier in Federal Defendants' brief that "establishing the Royalty Policy Committee *supported repeal* …." Defs.' Mot. at 12 (emphasis added).

a new, revised valuation rule that will address the various problems that have now been identified in the rule we are repealing." 82 Fed. Reg. 36,934, 36,934.  Thus, the Court finds that the ONRR did, in fact, purport to rely on the possibility of future findings of the Royalty Policy Committee as a basis for the Final Repeal, and in doing so, violated the APA.

### B.   NOTICE AND COMMENT REQUIREMENT

As an independent basis for their APA claims, Plaintiffs aver that the ONRR failed to allow for meaningful public comment on the Proposed Repeal in two significant respects.  First, the Proposed Repeal lacked adequate detail to meaningfully inform the public regarding the ONRR's rationale for repealing the Valuation Rule.  Second, the Proposed Repeal failed to invite comments on the substance or merits of the Valuation Rule and the prior regulatory scheme that it replaced.  Because of these shortcomings, the ONRR allegedly deprived the public of a meaningful opportunity to comment on important components of the Proposed Repeal, as required by the APA.

### 1.   Overview

The APA requires that, as a prerequisite to promulgating regulations, an agency must issue a "[g]eneral notice of proposed rulemaking" in the Federal Register.  5 U.S.C. § 553(b).  The notice must inform the public of "the time, place, and nature of public rulemaking proceedings," "the legal authority under which the rule is proposed," and "the terms or substance of the proposed rule or a description of the subjects and issues involved."  Id. § 553(b)(1)-(3).  After providing the required notice, the agency must provide for a comment process.  Specifically, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  Id. § 553(c).  "Among the purposes of the APA's notice and comment requirements are '(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial

1  review.'" <u>Prometheus Radio Project v. F.C.C.</u>, 652 F.3d 431, 449 (3d Cir. 2011) (citation

2  omitted); <u>accord</u> <u>Idaho Farm Bureau Fed'n v. Babbitt</u>, 58 F.3d 1392, 1404 (9th Cir. 1995)

3  ("The purpose of the notice and comment requirement is to provide for meaningful public

4  participation in the rule-making process.").

5        The above notice and comment requirement likewise applies when an agency seeks

6  to amend or repeal a rule that has previously has been promulgated.  <u>See</u> <u>Am. Hosp. Ass'n</u>

7  <u>v. Bowen</u>, 834 F.2d 1037, 1044 (D.C. Cir. 1987) ("Section 553 of the Administrative

8  Procedure Act requires agencies to afford notice of a proposed rulemaking and an

9  opportunity for public comment prior to a rule's promulgation, amendment, modification,

10  or repeal.").  "The value of notice and comment prior to repeal of a final rule is that it

11  ensures that an agency will not undo all that it accomplished through its rulemaking without

12  giving all parties an opportunity to comment on the wisdom of repeal." <u>Consumer Energy</u>

13  <u>Council of Am. v. Fed. Energy Regulatory Comm'n</u>, 673 F.2d 425, 446 (D.C. Cir. 1982).

14  If an agency fails to comply with these procedures, a court "must" set aside the rule.

15  <u>California v. Azar</u>, 911 F.3d 558, 575 (9th Cir. 2018) (citing 5 U.S.C. § 706(2)(D)).

16        The APA imposes exacting requirements regarding the content of notices.  Under

17  5 U.S.C. § 553, an agency "must provide notice sufficient to fairly apprise interested

18  persons of the subjects and issues before the Agency."  <u>Nat. Res. Def. Council, Inc. v. U.S.</u>

19  <u>E.P.A.</u>, 863 F.2d 1420, 1429 (9th Cir. 1988).  "[A]n agency proposing informal rule-

20  making has an obligation to make its views known to the public in a concrete and focused

21  form so as to make criticism or formulation of alternatives possible."  <u>Home Box Office,</u>

22  <u>Inc. v. F.C.C.</u>, 567 F.2d 9, 35 (D.C. Cir. 1977).  "Consequently, the notice required by the

23  APA, or information subsequently supplied to the public, must disclose the thinking that

24  has animated the form of a proposed rule and the data upon which that rule is based."  <u>Id.</u> at

25  35.

26             **2.    Failure to Recite Rationale for Repeal**

27        Plaintiffs contend that the Proposed Repeal failed to adequately inform the public of

28  the ONRR's rationale for repealing the Valuation Rule.  The Court agrees.  The Proposed

Repeal asserted that the Valuation Rule should be repealed so that the ONRR could reconsider whether changes to the Valuation Rule were needed and to avoid the costs of implementing its "controversial" provisions.  82 Fed. Reg. 16,323.  The areas allegedly requiring reconsideration are listed as "how to value coal production in certain non-arm's length transactions, how to value coal when the first arm's-length sale of the coal is electricity, how to value gas in certain no-sale situations, and under what circumstances, and on whom, ONRR's valuation determinations are binding."  Id.  The notice also claimed that a repeal would be consistent with Executive Order 13783.  Id.

The Proposed Repeal fails to pass muster under the APA.  As an initial matter, it is not enough that an agency merely identify some of the problems it believes may justify a repeal; rather, "[n]otice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment[.]"  Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1132 (D.C. Cir. 1995) (citation omitted); Home Box Office, 567 F.2d at 35 ("[T]he notice required by the APA … must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based").  That level of detail is lacking in the Proposed Repeal, which merely recites conclusions.  Absent is any detailed analysis, supported by evidence, explaining the reasons why the identified generalized areas of concern merited reconsideration, much less why they justified repealing the Valuation Rule in its entirety and reimplementing a regulatory framework which the ONRR itself had previously acknowledged was deficient.[17]  Likewise, the notice failed to provide the requisite explanation as to how repealing the Valuation Rule was necessary to comply with Executive Order 13783.

Federal Defendants argue that the ONRR had no obligation to identify "every possible reason in its notice" and merely identifying some of the agency's concerns with the Valuation Rule was enough to comply with the APA's requirements.  Fed. Defs.' Opp'n

---

[17] It bears noting that, in contrast to the few sentences in the Proposed Repeal identifying the purported defects with the Valuation Rule, the Final Repeal allocated five pages to discussing those defects—as well as other alleged problems mentioned nowhere in the Proposed Repeal.

at 22.  Perhaps so, but that argument misses the point.  Plaintiffs are not faulting the ONRR for failing to identify every conceivable problem with the Valuation Rule.  Rather, the problem is that the Proposed Repeal fails to explain in detail the reasons the ONRR allegedly believed that the problems it previously had identified now justify the complete repeal of the Valuation Rule. Without that information, Plaintiffs aver, the public could not meaningfully comment on the ONRR's proposed repeal. See Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n, 673 F.2d 525, 530 (D.C. Cir. 1982) ("The purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticisms to the agency during the rule-making process.  If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals.").  Tellingly, neither Federal Defendants nor Industry Intervenors address let alone acknowledge this omission.

The Court concludes that, by failing to provide the requisite information to adequately apprise the public regarding the reasons the ONRR was seeking to repeal the Valuation Rule in favor of the former regulations it had just replaced, the ONRR effectively precluded interested parties from meaningfully commenting on the proposed repeal.  See Connecticut Light & Power Co., 673 F.2d at 530; accord Prometheus Radio Project, 652 F.3d at 452 (notice of proposed rulemaking lacked sufficient detail to permit "discussion of the actual issues involved"); Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1403 (9th Cir. 1995) (agency violated the APA by failing to the provide the public with an opportunity to comment on an important study relied upon by the agency "to support its final rule").  The Court therefore concludes that Federal Defendants violated the APA by failing to comply with the notice and comment requirement.  Nat. Res. Def. Council v. U.S. E.P.A., 279 F.3d 1180, 1186 (9th Cir. 2002) ("A decision made without adequate notice and comment is arbitrary or an abuse of discretion.") (citing 5 U.S.C. § 706(2)(A)).

### 3.    Failure to Solicit Comments

As an alternative matter, Plaintiffs argue that the ONRR violated the APA by failing to allow for meaningful comment on their proposed rules.  5 U.S.C. § 553(c).  As discussed, it is imperative that an agency provide a "meaningful opportunity for comment" on the merits of the proposed agency action.  N. Carolina Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755, 770 (4th Cir. 2012).  According to Plaintiffs, the Proposed Repeal improperly limited comments to whether or not to repeal the Valuation Rule without soliciting and considering comments regarding the substantive merit of the Valuation Rule or the pre-Valuation Rule regulations.

The Fourth Circuit's decision in North Carolina Growers' Association is instructive. In that case, various plaintiffs brought an APA action against the Department of Labor ("Department") after it suspended 2008 regulations governing temporary agricultural workers and reinstated the prior set of 1987 regulations.  In its notice of proposed rulemaking, the Department cited difficulties in operating the program governing the employment of foreign agricultural workers under the 2008 regulations, including a lack of resources, inability to implement operations and processing delays, as the basis for the proposed action.  Id. at 770.  The notice further stated that the Department "would consider comments concerning the suspension action itself, and not regarding the merits of either set of regulations[.]"  Id. at 761.

The Fourth Circuit held that the Department's "content restriction" in the notice of rulemaking violated the APA.  Id. at 770.  In reaching its decision, the court explained that the issues identified in the suspension notice "were significant, substantive matters," which necessarily implicated concerns regarding the relative merits of both sets of regulations.  Id. The exclusion of comments on the merits of the regulations, however, prevented the Department from receiving or considering "comments that were not only 'relevant and important,' but were integral to the proposed agency action and the conditions that such action sought to alleviate."  Id. at 769-770.  "[T]he content restriction was so severe in scope, by preventing any discussion of the 'substance or merits' of either set of regulations,

that the opportunity for comment cannot be said to have been 'a meaningful opportunity.'" Id. (citing Prometheus Radio Project, 652 F.3d at 450). The court concluded that because of the Department's failure to comply with the notice and comment requirements, "the Department's action was arbitrary and capricious, in that the Department failed to follow procedures required by law." Id. at 771.

Plaintiffs argue that, like the suspension notice in North Carolina Growers' Association, the notice of rulemaking limited comments to the repeal itself, while excluding consideration of any comments regarding the merits of either the Valuation Rule or pre-Valuation Rule regulations. They contend that comments pertinent to the merits of those regulation were inappropriately deferred to the ANPRM, even though they were inextricably intertwined with the question of the whether the Valuation Rule should have been repealed in first instance. Federal Defendants counter that the Proposed Repeal did not expressly limit the scope of comments to be considered and that the ONRR fully considered comments presented in response to the Proposed Repeal and ANPRM in its repeal decision. As will be discussed below, the Court finds that Plaintiffs have presented the more compelling argument.

To facilitate the repeal of the Valuation Rule, the ONRR published two proposed agency actions simultaneously: the Proposed Repeal and the ANPRM. The Proposed Repeal recited the ONRR's intention to repeal the Valuation Rule, which would thereby "maintain the current regulatory *status quo* by keeping the longstanding pre-existing regulations in effect." 82 Fed. Reg. 16,323.[18] The justifications for the proposed repeal include "serious concerns regarding the validity or prudence of certain provisions of the 2017 Valuation Rule, such as the expansion of the 'default provision' and the use of the sales price of electricity to value coal." 82 Fed. Reg. 16,323. Separately, the ANPRM

---

[18] As Judge Laporte recognized in Becerra, the ONRR's use of the term "status quo" is inaccurate and misleading. 276 F. Supp. 3d at 964. She noted that the "ONRR's suspension of the Rule did not merely 'maintain the status quo,' but instead prematurely restored a prior regulatory regime." Id. For the same reasons, the ONRR's use of the term "status quo" in the Proposed Repeal was improper.

purported to seek comments depending on the outcome of the Proposed Repeal.  First, in the event the Valuation Rule were repealed, whether new rulemaking would be warranted. 82 Fed. Reg. 16,325, 16326.  Second, if the Valuation Rule were retained, whether changes thereto would be needed.  Id.

The Proposed Repeal does not provide any guidance on the comments the ONRR was seeking.  Nevertheless, the ANPRM confirms that the focus of the comments to be submitted in response to the Proposed Repeal was limited to whether to repeal the Valuation Rule and restore the pre-Valuation Rule regulations.  82 Fed. Reg. 16,325 ("In [the Proposed Repeal], [the] ONRR is seeking comments on a proposed rule to repeal the 2017 Valuation Rule to maintain the status quo in which the pre-existing regulations remain in effect while ONRR reconsiders whether changes made by the 2017 Valuation Rule are needed or appropriate.").  In contrast, as to comments germane to the merits of the Valuation Rule and the pre-Valuation Rule regulations, the Proposed Repeal unequivocally stated that they are to be presented and considered in connection *with the ANPRM*.  82 Fed. Reg. 16,323 ("Concurrently with this notice, ONRR is publishing an [ANPRM] seeking comments on whether revisions are appropriate or needed to the preexisting regulations governing royalty values, including comments on whether the 2017 Valuation Rule should ultimately be retained or repromulgated.").[19]

Though the Proposed Repeal did not impose an express content restriction, it effectuated a *de facto* one by deferring consideration of substantive comments regarding the regulations at issue to the ANPRM.  Like the suspension notice at issue in North Carolina

---

[19] Notably, the ANPRM delineates in detail the specific merit-based comments to be submitted, such as whether the Valuation Rule should be amended or whether "new rulemaking would be beneficial or necessary" if the Rule is repealed.  82 Fed. Reg. 16,325, 16,326; see also supra § I.A.3 (summarizing comments solicited in the ANPRM).  For instance, the ANPRM sought comments on "[h]ow to best value non-arm's length coal sales and/or sales between affiliates."  82 Fed. Reg. 16,325, 16,326.  That question would have more appropriately been included with the Proposed Repeal, particularly since the ONRR had identified the valuation of coal "in certain non-arm's length transactions" as one of the alleged key defects warranting repeal of the Valuation Rule.  See 82 Fed. Reg. 16323.  Thus, by relegating comments bearing on the regulatory schemes at issue to the ANPRM, the ONRR effectively failed to provide for a manner meaningful opportunity to comment on the repeal.

1   Growers' Association, the Proposed Repeal claimed that implementation of and compliance

2   with the recently-enacted regulations were problematic, and therefore the current

3   regulations should be rescinded and prior regulations reinstated.  The alleged problems

4   identified in the Proposed Repeal raised "relevant and significant issues" which, in turn,

5   obligated the ONRR to consider and address comments concerning the substance and

6   merits of both the Valuation Rule and pre-Valuation Rule regulations.  See N. Carolina

7   Growers' Ass'n, 702 F.3d at 770.  Yet, because of the ONRR's artificial segregation of the

8   comments between the Proposed Repeal and ANPRM, the ONRR failed to provide a

9   meaningful opportunity to comment substantively on Proposed Repeal.  Id.

10       For their part, Federal Defendants do not directly address whether the ONRR

11   impermissibly deferred the comment process to the ANPRM.  Instead, they argue that the

12   ONRR "considered all of the comments it received for both the proposed repeal and the

13   [ANPRM], regardless of their content."  Fed. Defs.' Opp'n at 23 (citing AR 008957-60, AR

14   008961-62, AR 008973-81, AR 009011-12).  But whether or not the ONRR considered all

15   comments received is separate and distinct from whether the ONRR complied with the

16   notice and comment requirement in the first instance.  In any event, the record documents

17   cited by Federal Defendants only show that ONRR staff summarized the thirty-three

18   comments received in response to the ANPRM, see AR 8961-62, 8973-81; there is no

19   indication that the ONRR responded to or otherwise considered them in deciding to repeal

20   the Valuation Rule.  Indeed, the record shows that ONRR staff treated the ANPRM and

21   Proposed Repeal as separate undertakings.  See AR 8785-86.

22       Finally, the ONRR's failure to provide a meaningful opportunity to comment is

23   underscored by the brevity of the comment period.  While there is no bright-line test for the

24   minimum amount of time allotted for the comment period, North Carolina Growers' Ass'n,

25   702 F.3d at 770, at least one circuit has recognized that 90 days is the "usual" amount of

26   time allotted for a comment period, Prometheus Radio Project, 652 F.3d at 453.  In cases

27   involving the repeal of regulations, courts have considered the length of the comment

28   period utilized in the prior rulemaking process as we well as the number of comments

received during that time-period.  See North Carolina Growers' Ass'n, 702 F.3d at 770 (holding that a 10-day comment period which resulted in 800 comments failed to provide an "adequate opportunity for comment," considering that during the prior rule making the agency received about 11,000 comments over a 60-day comment period).

In the instant case, a comparison between the ONRR's rulemaking process leading to the Valuation Rule and the process used to repeal it exemplifies the ONRR's failure to provide for a meaningful rulemaking process.  The Valuation Rule was promulgated following an extensive period of consideration.  After issuing two advanced notices of rulemaking in 2011, the ONRR embarked on a five-year rulemaking process that included public workshops and extensive outreach to the industry, government and public.  In January 2015, the ONRR published a draft Valuation Rule followed by a 60-day comment period, which was extended to 120 days at the request of coal and oil and gas companies and their trade associations.  AR 6381.  During the public comment period, the ONRR received more than 1,000 pages of written comments, from over 300 commenters and 190,000 petition signatories.  81 Fed. Reg. 43,338, 43,338.

In contrast to the *years* of consideration leading to the promulgation of the Valuation Rule, the ONRR's actions to repeal it took place in a matter of *months*.  Whereas the ONRR provided a 120-day comment period for the draft Valuation Rule, the ONRR allowed only a 30-day comment period to consider its repeal.[20]  Even then, the ONRR deferred consideration of substantive comments regarding the royalty regulations to the ANPRM.  82 Fed. Reg. 16,325.  Federal Defendants do not dispute this, but counter that the Proposed Repeal generated a larger public response (2,342 commenters) than the notice of the draft Valuation Rule (300 commenters).  But these numbers do not tell the entire story.

---

[20] Defendants dismiss this disparity, claiming that a comment period as short as 10 days have been found to be adequate.  Fed. Defs.' Opp'n at 21.  However, "instances actually warranting a 10-day comment period will be rare" and generally are limited to instances "characterized by the presence of exigent circumstances in which agency action was required in a mere matter of days."  N. Carolina Growers' Ass'n, 702 F.3d at 770.  No such exigent circumstances have been alleged by the ONRR or are apparent from the record.

The 2,342 Proposed Repeal commenters generated around 1,000 comments.[21]  The 300 commenters responding to the Proposed Valuation Rule generated over 1,000 pages of comments.  81 Fed. Reg. 43,338, 43,338.  In addition, 190,000 petition signatories submitted comments specifically regarding the proposed coal valuation rules.  Id.  Thus, notwithstanding Federal Defendants' intimations to the contrary, the apparently larger number of commenters does not show that the ONRR provided an adequate amount of time for comments.

Based on the record presented, the Court finds that the ONRR failed to provide meaningful opportunity for comment.  The ONRR did not solicit or receive substantive comments regarding either the Valuation Rule or pre-Valuation Rule regulations nor did it fully consider the comments received in repealing the Valuation Rule.  As a result, the ONRR "ignored important aspects of the problem."  United Farm Workers, 702 F.3d at 770 ("[B]ecause the Department did not provide a meaningful opportunity for comment, and did not solicit or receive relevant comments regarding the substance or merits of either set of regulations, we have no difficulty in concluding that the Department 'ignored important aspects of the problem.'") (citation omitted).  The ONRR's repeal of the Valuation Rule and reinstatement of the prior regulations was therefore arbitrary and capricious.  See id. (citing 5 U.S.C. § 706(2)).

## C.   REMAINING CLAIMS

Plaintiffs' second cause of action alleges violations of FOGRMA, FLPMA, MLA and the APA.  Federal Defendants contend that they are entitled to summary judgment on the non-APA claim.  Fed. Defs.' Mot. at 23-24.  Since Plaintiffs do not respond to this argument in their reply, the Court deems this claim abandoned.  See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) ("We have previously held that plaintiff has 'abandoned ... claims by not raising them in opposition to [the defendant's] motion for summary judgment.'") (quoting Jenkins v. Cnty. of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir.

---

[21] The Final Repeal states that the ONRR received "more than a thousand comments from 2,342 commenters."  82 Fed. Reg. 36,934, 36,935.

2005)).  Plaintiffs' second cause of action, insofar as it is premised on FOGRMA, FLPMA and MLA, is dismissed.  See Shakur, 514 F.3d at 892 (dismissing abandoned claim). Federal Defendants' motion for summary judgment as to the aforementioned claim is therefore denied as moot.

### D.   REMEDY

The Court has determined above that the ONRR violated the APA, which presents the final question as to the proper remedy for such violation.  The Complaint seeks declaratory relief and vacatur as relief.  For the reasons discussed above, the Court finds that declaratory relief is the proper remedy for the ONRR's violation of the APA.  Thus, the Court finds and declares that Federal Defendants' Final Repeal was arbitrary and capricious.  See Becerra, 276 F. Supp. 3d at 966 (granting declaratory relief and finding that the DOI's postponement of the Valuation Rule was in violation of the APA).

Plaintiffs also seeks vacatur of the Final Repeal.  Vacatur is the "standard remedy" when a court concludes that an agency's conduct was illegal under the APA.  See Stewardship Council v. EPA, 806 F.3d 520, 532 (9th Cir. 2015).  At the same time, a flawed rule need not be vacated in every instance.  Cal. Communities Against Toxics v. EPA, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (noting that "'when equity demands, the regulation can be left in place while the agency follows the necessary procedures' to correct its action") (citation omitted).  To determine if vacatur is appropriate, courts consider (1) the seriousness of the agency's errors and (2) "the disruptive consequences" that would result from vacatur.  Id.

Federal Defendants deny that they committed any errors and claim that vacating the Final Repeal will be disruptive.  They also request an opportunity to submit further briefing on these issues.  With regard to the first point, the Court finds that the ONRR committed a number of serious violations of the APA and that its repeal of the Valuation Rule was effectuated in a wholly improper manner.  As discussed more fully above, the ONRR violated clearly established Supreme Court precedent requiring an agency to provide a reasoned explanation for disregarding and contradicting facts and circumstances underlying

the adoption of the rules that it now seeks to repeal.  In addition, the ONRR failed to comport with the APA's notice and comment requirement, thereby denying the public a meaningful opportunity to participate in the regulatory process.  The Court finds these violations to be serious.

The Court also is unpersuaded by Federal Defendants claim that vacating the Final Repeal will be unduly disruptive.  The only disruption identified is "that lessees and the ONRR would need [time] to convert their accounting systems."  Fed. Defs.' Mot. at 25. Setting aside the lack of any facts in the record to support that assertion, Federal Defendants overlook that any significant change in the rules governing royalty calculations inevitably will result in a period of adjustment for interested parties.  As for further briefing, the Court finds it unnecessary.  Federal Defendants have had ample opportunity to prepare their briefs in this action.  As such, any arguments regarding whether vacatur is warranted should have been included in their motion papers.  Moreover, further briefing will result in further delay.  The Valuation Rule was originally scheduled to take effect on January 1, 2017, but, due to the ONRR's improper attempt to postpone the rule and subsequent repeal, none of its royalty valuation provisions were implemented.

The Court finds that both declaratory relief and vacatur are appropriate remedies based on the ONRR's violations of the APA.

## IV.   **CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1.      Conservation Intervenors and Industry Intervenors' motions to intervene are GRANTED.

2.      The Institute's motion for leave to file an amicus curiae brief is GRANTED.

3.      Plaintiff and Conservation Intervenors' motions for summary judgment are GRANTED.  The Court finds and declares that the ONRR violated the APA when it issued the Final Repeal, which shall be vacated.  Federal Defendants and Conservation Intervenors' motions are DENIED.

1

4.      Plaintiffs' second cause of action is DISMISSED insofar as it is premised on

2

statutes other than the APA.

3

IT IS SO ORDERED.

4

Dated:  3/29/19

5

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28